UNITED STATES of America,
Plaintiff-Appellee,

v.

Edwin P. WILSON,
Defendant-Appellant.

No. 83–2125.

United States Court of Appeals,
Fifth Circuit.

May 4, 1984.

Marian S. Rosen, Houston, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for defendant-appellee.

Before GEE, POLITZ and JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Convicted by jury of conspiracy, 18 U.S.C. § 371, and of substantive counts arising out of an illegal shipment of plastic explosives, contrary to 18 U.S.C. §§ 2 and 1001, 22 U.S.C. § 2778(c), and 49 U.S.C. § 1809(b), Edwin P. Wilson appeals, assigning multiple errors. Finding no reversible error, we affirm.

### Procedural Background

Wilson, Edward Bloom and Donald Thresher were indicted for conspiracy to make an illegal shipment of twenty tons of C–4 plastic explosives from Houston, Texas to Tripoli, Libya in October 1977. Bloom and Thresher were severed. Bloom was separately tried and convicted; Thresher pled guilty to a misdemeanor charge.

The indictment contains four counts. Count one charges the conspiracy, 18 U.S.C. § 371. Count two charges the presentation of a falsified Shipper's Export Declaration, which listed the explosives as

drilling mud, 18 U.S.C. §§ 2 and 1001. Count three charges the export of cyclotrimethylene trinitramine (the active ingredient in the C–4 explosive) without obtaining the required license from the State Department, in violation of 22 U.S.C. § 2778(c), 18 U.S.C. § 2, and Title 22 C.F.R. §§ 121.01 (category V), 121.11, 123.01. Count four charges the illegal transportation of a hazardous material by cargo aircraft, in violation of 49 U.S.C. § 1809(b), 18 U.S.C. § 2, and 49 C.F.R. §§ 172.100, 172.101.

Prior to trial two hearings were conducted. The first involved Wilson's motion to dismiss the indictment because of the manner in which he was taken into custody and brought before the court. Wilson maintained that the government had acted improperly in luring him back to the United States. The district court denied this motion. The court then conducted a *James* hearing and made the requisite findings of a conspiracy and Wilson's involvement in it. After trial, the jury returned verdicts of guilty on all four counts.

### Factual Background

In early 1977, Jerome S. Brower, a manufacturer and distributor of explosives from Pomona, California, met with Wilson to discuss the purchase by Wilson of C–4 explosives for shipment to Libya. Brower obtained 40,000 pounds which he sold to Wilson for $13.75 per pound, payable in advance to Brower's account in a Swiss bank. The payment was made on August 18, 1977. At Wilson's direction, Brower prepared an invoice reflecting a price of $20 per pound.

After acquiring the C–4 from different sources Brower packaged it in five-gallon cans and covered it with drilling mud. Brower completed the disguise by affixing fictitious drilling mud labels.

The camouflaged explosives were trucked to Houston and loaded on a chartered DC–8 for ostensible shipment to Lisbon, Portugal. The flight did not terminate in Portugal, but continued to Tripoli, Libya where the aircraft was met by Wilson who directed the ultimate delivery of the explosives.

In the shipping process, Wilson's representative falsified the shipping documents by claiming that the cargo was drilling mud additive and by falsely declaring the destination. No license to export was secured and the cargo carrier was not informed of the hazardous nature of the shipment.

### Assignments of Errors

#### 1. "CIA Defense"

Wilson contends that he was denied a fair trial because evidence probative of his intent was excluded, thus denying him an opportunity to present his "CIA defense." He maintains that he was precluded from introducing evidence that he was either employed by the Central Intelligence Agency or his actions were welcomed and sanctioned by that agency. By showing the government's approval of his actions and that the apparent criminal acts were a cover for governmental operations, Wilson argues that he could have demonstrated his lack of specific intent to commit the violations charged.

The record belies Wilson's assertions that he was not accorded an opportunity to develop his "CIA defense."[1] He was al-

---

1. The trial court made it clear that Wilson was free to develop this defense:

    The Court: ... There will be no evidence offered at the trial concerning the details of that. If you want to get up there and say, yes, I was sending back valuable information; I was involved in projects before, during and after, but we are not going to talk about the projects or the information.
    [Defense counsel]: Do I understand your ruling, that we will be permitted to discuss the

    projects, as a defensive matter, but we can't go into detail?
    The Court: What do you mean by discuss the projects?
    [Defense counsel]: During this entire timeframe, Your Honor, that Mr. Wilson was working over there with the full knowledge of some high officials with the Government, that they knew he had a cover company, that he had been operating in the same manner that he had to some extent previously, and that he was to a great extent given free license to do

lowed that opportunity. Wilson claims, however, that the exclusion of the testimony of former Attorney General Ramsey Clark and a portion of the proposed testimony of Victor L. Marchetti, undercut the development of this defense. There is no suggestion that Clark had personal knowledge of Wilson or of his activities. Marchetti denied having such knowledge. There is an indication that in an earlier case Clark testified that the CIA had once claimed non-involvement in an incident. This later proved untrue. The record also reflects that Marchetti formerly worked for the CIA but had left that employment 14 years before the trial and eight years before the C–4 shipment. Thereafter his knowledge about CIA activities and practices was limited to public information and conversations with friends in the agency. We find nothing to support a suggestion that Clark or Marchetti had any expert knowledge about the specific types of activities Wilson purportedly engaged in or about the CIA involvement in such activities.

Since neither Clark nor Marchetti had pertinent personal knowledge of Wilson or of his association or involvement with the CIA, their testimony could only relate to irrelevant issues or to facts involving the internal practices and procedures of the agency. Clark had no such knowledge and Marchetti's knowledge was dated. If they were ostensible expert witnesses on agency practices and procedures it fell within "the trial judge['s] broad discretion in the matter of the admission or exclusion of expert testimony, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Considering the attenuated nature of the proffered testimony, we cannot say that the trial court's exclusion constituted reversible error. *See Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979).

whatever would be necessary in order to establish the confidence of the Libyans, and during this timeframe that he was doing things, reporting to certain people here with

### 2. *Good Faith Defense*

■ Wilson contends that he was denied a fair trial because the trial judge declined to instruct the jury on his good faith defense. The trial judge refused the instruction for lack of sufficient evidence to support the claimed defense. We agree. *United States v. Caicedo-Asprilla*, 632 F.2d 1161 (5th Cir.1980). The evidence which Wilson marshals in support of this assigned error "was insufficient to instruct the jury on the availability of that defense." *Id.* at 1171. Wilson's evidence indicates that during the period of his activities in Libya, Wilson twice met with United States government officials, received a list of Russian military equipment from a CIA agent, discussed with U.S. officials the possibility of acquiring a Russian aircraft through Libya and delivered what was purportedly a set of plans for an atomic weapon. But there is no evidence of government authorizations, express or implied, for the C–4 shipment to Libya. The trial judge did not err in denying the good faith defense instruction.

### 3. *Extraneous Offenses*

■ Defendant contends that his trial was tainted by the government's introduction of evidence concerning extraneous offenses and incidents involving terrorism. Wilson complains of testimony that in 1976 he supported terrorist activities including the building of booby traps, letter bombs and the shipment of explosives to England. He complains of evidence that in 1979 similar cans as were involved in the instant shipment were seen in a Rotterdam warehouse and two such cans were recovered in 1982. He further complains of the use of a videotape showing the recovery of cans containing C–4 and detonation tests reflecting the explosive power of C–4. Wilson further complains of testimony by Brower about a contract Brower had to furnish

the Government. It seems to me that all of that is very relevant to the man's defense. The Court: Yes, to that extent, I would certainly permit it.

personnel for production of certain "clandestine devices" in Libya. These devices included lamps that exploded instead of lighting, fire extinguishers that blew up instead of spraying an apyrous material, and briefcases which detonated on command. In closing argument the prosecutor stressed the terrorist training schools, explosive devices and the contents of the videotape.

■ The evidence was offered by the government under Fed.R.Evid. 404(b).[2] Admissibility of such evidence is governed by the rule as expressed in *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978):

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.

The first prong is immediately satisfied; the government offered the evidence to establish Wilson's motive, intent and plan. The more difficult question is posed by the second requirement.

The advisory committee notes to Rule 404(b) caution that

> No mechanical solution [to the issue of admissibility of extrinsic offense evidence] is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403.

28 U.S.C.A. Rules of Evidence at 109 (1975). The determination of probative value vs. unfair prejudice "calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense." *Beechum*, 582 F.2d at 914. Wilson sought

to justify his acts by claiming that he had no intent to commit the charged crimes. The prosecution's evidence was probative of that essential element, and the particular extrinsic acts were sufficiently proximate to the alleged offenses. We perceive no error in the decision that the probative value was not substantially outweighed by the danger of unfair prejudice. Nor do any of the other Rule 403 grounds for exclusion apply.

### 4. *Evidence Before Grand Jury*

Wilson submits that the indictment was defective because the grand jury process was abused by the presentation of certain evidence, including extraneous offense evidence. The grand jury which returned the indictment at bar received testimony previously presented to two other grand juries.

■ Traditionally, the grand jury has been accorded wide latitude in its investigation of possible criminal offenses. The grand jury may draw its information from a wide variety of sources, and "the validity of an indictment is not affected by the character of the evidence considered." *United States v. Calandra*, 414 U.S. 338, 343–45, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974). A grand jury is not limited to the witnesses or alleged offenders brought before it and is not confined to the evidence or charges presented to it. *United States v. Thompson*, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1970). The grand jury is free of the restraints of technical, procedural and evidentiary rules that govern the conduct of criminal trials. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. McKenzie*, 678 F.2d 629 (5th Cir.1982). It may consider any evidence bearing upon the defendant's guilt, regardless of whether that evidence would be excluded at trial. Courts have consistently refused to dismiss an indictment when the challenge primarily ques-

---

**2.** Fed.R.Evid. 404(b) provides:

OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

tioned the quality or quantity of the evidence before the grand jury. *See United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (refusing to dismiss indictment based upon evidence obtained in unlawful search and seizure); *United States v. Costello,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (refusing to dismiss indictment based upon hearsay); *United States v. Ocanas,* 628 F.2d 353 (5th Cir.1980) (refusing to dismiss indictment based upon evidence obtained in violation of Fed.R.Crim.P. 11(e)(6)). Wilson's challenge to the indictment is without merit.

### 5. Biased Jurors

■ Wilson claims denial of a fair trial because the court refused to excuse for cause two jurors who purportedly were biased against him. The record does not support this contention.

One of the challenged jurors testified during voir dire examination that he had seen a television broadcast about Wilson, and although he thought it placed Wilson in a bad light, he could not recall any specifics. This juror said he understood the presumption of innocence, and he expressly assured that any prior media exposure would not affect his ability to serve impartially. Wilson does not indicate the basis for the challenge to the second juror other than to note her prior close affinity to law enforcement, through employment and marriage, and because of answers which would support a conclusion that she had no opinion of Wilson's guilt or innocence. Of this juror, Wilson suggests "it was very apparent she was trying to give noncommittal type answers so that she could be on the jury and was obviously not being truthful with the Court." The trial judge was not so impressed, nor are we.

■ It is within the discretion of the trial judge to accept jurors exposed to pretrial publicity when the court is satisfied the juror can return a verdict based solely on the evidence adduced and the law as charged. *United States v. Jimenez-Diaz,* 659 F.2d 562 (5th Cir.1981). Mere awareness of some of the allegations in a case does not disqualify a potential juror. *United States v. Dozier,* 672 F.2d 531 (5th Cir. 1982). A trial court will be reversed only upon a showing of clear abuse of discretion. *United States v. Giacalone,* 588 F.2d 1158 (5th Cir.1978). We find no abuse in the trial court's refusal to allow these two jurors to be challenged for cause.

### 6. Misconduct in Securing Custody of Defendant

■ Wilson charges that the court's jurisdiction over his person was secured by fraud and force and the court should dismiss the indictment. Alleging governmental misconduct Wilson cites as authority *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974).

In *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), the Supreme Court held that the power of a court to try a person for a crime would not be impaired by the fact that the person was forcibly brought within the court's jurisdiction. The Court has consistently so ruled through a line of cases [3] leading to *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), and beyond, *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

Wilson cites *Toscanino* for the proposition that the courts have moved away from the *Ker-Frisbie* rule, and, taking a broader view of due process, would deny jurisdiction when the defendant's physical presence is obtained through fraud or force. We are not persuaded. In *Toscanino,* the defendant was kidnapped, beaten and tortured. The Second Circuit, appalled at the violation of the standard of human decency, concluded that due process required dismissal of the indictment. *Citing Ro-*

---

**3.** *See, e.g., Mahon v. Justice,* 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283 (1888); *Lascelles v. Georgia,* 148 U.S. 537, 13 S.Ct. 687, 37 L.Ed. 549 (1893); and *In re Johnson,* 167 U.S. 120, 17 S.Ct. 735, 42 L.Ed. 103 (1897).

*chin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), our colleagues noted that a court can "be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Toscanino*, 500 F.2d at 274. The Supreme Court had noted such in *Ker:* "We do not intend to say that there may not be proceedings previous to the trial, in regard to which the presence could invoke in some manner the provisions of [the due process] clause of the Constitution." *Ker*, 119 U.S. at 440, 7 S.Ct. at 227.

We earlier indicated that we did not accept *Toscanino* as a departure from the long standing rule, and we made it clear that we would not follow it if it were. *United States v. Herrera*, 504 F.2d 859 (5th Cir.1974), *citing Ker* and *Frisbie*, and our decisions in *United States v. Caramian*, 468 F.2d 1370 (5th Cir.1972); *United States v. Vicars*, 467 F.2d 452 (5th Cir. 1972), and that of our sister circuits, *United States v. Cotten*, 471 F.2d 744 (9th Cir.1973), and *Hobson v. Crouse*, 332 F.2d 561 (10th Cir.1964).

The Second Circuit subsequently clarified its *Toscanino* holding in *United States Ex Rel Lujan v. Gengler*, 510 F.2d 62 (2d Cir.1975), a case factually similar to that now before us. In *Lujan* the defendant was induced to fly from Argentina to Bolivia, supposedly for business reasons. Instead, American agents were waiting to apprehend him for a return to the United States to face criminal charges. Apparently conscious of the concerns about the possible sweep of its *Toscanino* decision, the Second Circuit stated:

> [I]n recognizing that *Ker* and *Frisbie* no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that *any* irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceed-

ings of the criminal court. In holding that *Ker* and *Frisbie* must yield to the extent they were inconsistent with the Supreme Court's more recent pronouncements we scarcely could have meant to eviscerate the *Ker-Frisbie* rule, which the Supreme Court has never felt impelled to disavow. Although we cited other cases in *Toscanino* as evidence of the partial erosion of *Ker* and *Frisbie*, the twin pillars of our holding were *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and dictum in *United States v. Russell*, 411 U.S. at [423,] 431–432, 93 S.Ct. 1637 [1642–43, 36 L.Ed.2d 366], both of which dealt with government conduct of a most shocking and outrageous character.

510 F.2d at 65. Our analysis of *Ker* and its progeny compels the conclusion that unless the government conduct in securing custody of the defendant is shocking and outrageous, the court should not dismiss the indictment on a due process basis.

When Wilson was indicted he was not within the jurisdiction of the United States. He was considered a fugitive. He was duped by agents of the government who persuaded him to travel to the Dominican Republic. With the cooperation of the authorities there Wilson was placed on a commercial aircraft bound for the United States. Upon arrival he was taken into custody by federal agents. We perceive no factual basis for a deviation from the *Ker-Frisbie* rule. Wilson was the victim of a nonviolent trick. The district court correctly declined to dismiss the indictment.

### 7. *Insufficient Evidence of Intent*

Wilson contends that there was insufficient evidence of his specific intent to commit the crimes charged, specific intent being an element of all three offenses for which he was charged. *United States v. Hernandez*, 662 F.2d 289 (5th Cir.1981); *United States v. Wieschenberg*, 604 F.2d 326 (5th Cir.1979). Appellant correctly notes the items of proof required for a conviction but fails to note why the proof offered should be found wanting.

The standard for review of the sufficiency of the evidence in a criminal case is whether, viewing the evidence and all reasonable inferences most favorable to the prosecution, a reasonable jury could find the guilt of defendant proven beyond a reasonable doubt. The record before us is replete with evidence of Wilson's knowledge and involvement in the scheme to ship the explosives in an illegal manner. That he willfully intended to conspire and commit the alleged offenses was a matter for the jury's determination. Its finding is amply supported by the evidence.

### 8. *Exclusion of Classified Information*

■■■■ Wilson sought to offer classified information claimed to be relevant to his CIA defense and the issue of intent. In conformity with the requirements of the Classified Information Procedures Act (CIPA), 18 U.S.C. Appendix 3 (Supp.1983), 94 Stat. 2025, Wilson filed a Confidential Statement. The government responded by requesting an *in camera* hearing, as provided for by section 6 of CIPA, to determine the use, relevance and admissibility of the classified information. The government also sought a protective order on use and release of classified information. After a chambers conference the district judge orally stated his ruling on defendant's request. Wilson's filing listed nine general subjects areas, none of which related to the October 1977 shipment of C–4 from Houston to Libya. The trial court found this proposed evidence irrelevant and immaterial. Upon completion of our review of this record, including a studied examination of the classified filings, we conclude that the district court correctly found this evidence inadmissible under the ordinary rules of evidence, separate and apart from any CIPA consideration. CIPA does not "undertake to create new substantive law governing admissibility." *United States v. Collins,* 720 F.2d 1195, 1199 (11th Cir.1983).

### 9. *Suppression of Subpoenas Duces Tecum*

■■■ On the day jury selection was completed, Wilson served nine subpoenas duces tecum on various persons and agencies, including the Attorney General of the United States, the General Counsel of four intelligence agencies, the United States Attorney for the Southern District of Texas, the Federal Bureau of Investigation, and the National Security Agency. The subpoenas were identical except that the U.S. Attorney was asked for two items not requested from the other witnesses. The government viewed the subpoenas as an effort to circumvent the court's prior order and as a delay and harassment tactic. All were quashed.

Some of the information sought by the subpoenas previously had been found immaterial and irrelevant, a ruling we have approved. In addition, the subpoenas were general, overbroad and untimely. The district court did not err in quashing them. Fed.R.Crim.P. 17(c).

### 10. *Denial of Compulsory Process and Confrontation*

■■■ Wilson claims that in quashing the various subpoenas the district court violated his sixth amendment rights to compulsory process and confrontation. This claim is intertwined with issues earlier discussed, particularly those related to the CIA defense and to Wilson's assertion that specific intent and knowing criminal acts were not proven. Wilson was not denied an opportunity to offer his defense. He was not denied an opportunity to challenge the government's proof of specific intent. He called six witnesses. The limitations imposed by the district court's rulings on evidentiary matters did no violence to Wilson's constitutional guarantees. The criminal defendant's right to compulsory process is not absolute and the Constitution does not grant the right to subpoena any and all witnesses a party might wish to call. *Ross v. Estelle,* 694 F.2d 1008 (5th Cir.1983). The matter is addressed to the trial court's discretion. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

## 11. *Error in Applying CIPA*

██ Wilson complains that the district judge's ruling on the CIPA submissions was oral whereas CIPA requires that the basis for the court's determination is to be "set forth in writing." Section 6(a) of CIPA. The government concedes that the trial court failed to enter a written order or ruling but contends that Wilson failed to object timely and was not prejudiced. The trial judge on two occasions orally articulated his reasons for that ruling. Although CIPA requires that this determination be in writing, we are convinced that the dictation of reasons into the record, timely transcribed by the court reporter, obviated any likelihood of prejudice in this case. The noncompliance with CIPA, in this case, does not justify a reversal, for the court's failure to reduce its ruling to writing did not impact on the defense or upon the verdict of the jury. *See United States v. Heller,* 625 F.2d 594 (5th Cir.1980).

## 12. *Evidence by Affidavit*

██ The government introduced an affidavit of Charles A. Briggs, the Executive Director of the CIA and its third-ranking official, subordinate only to the Director and Deputy Director. In this affidavit Briggs declared that he authorized the Chief of the Information Management Staff to have access to all records of the CIA for the purpose of making a search for material "that in any way pertains to Mr. Edwin P. Wilson." Access was also authorized to the results of any prior search.

The government proposed to present the live testimony of the CIA employee who conducted and supervised the search, presumably the Chief of Information Management Staff. As a security matter the government sought permission to tender the witness under a pseudonym but proposed to disclose to the jury his position in the CIA, his access to and review of CIA records, and a description of his background sufficient to qualify him as an expert in covert operations. The government sought an order prohibiting cross-examination about the proposed witness's real name, his exact address and specific details of his CIA covert activities. The defendant objected to the restrictions and the court sustained the objection. The government offered the Briggs affidavit in the place of the testimony of that witness.

The court permitted introduction of the Briggs affidavit under Fed.R.Evid. 803(7) & (10). Wilson contends that admission of this affidavit was error because: (1) it was inadmissible hearsay, (2) if admissible as an exception to the hearsay rule it violated his right of confrontation, and (3) it was procedurally defective.

The affidavit was not inadmissible hearsay. It comes within the purview of the exception contained in Rule 803(10), which provides for proof of the absence of a record by a certification in accordance with Fed.R.Evid. 902. The affidavit, read as a whole, substantially conforms to Rules 803(10) and 902. It was executed by the third highest official of the CIA whose duties include overall management, and it is attested to by the General Counsel of the CIA, the custodian of the seal of the CIA.

Wilson argues that introduction of the affidavit violated his right to confrontation of witnesses. The claim is not devoid of merit but it is not sufficient to render the affidavit inadmissible as a matter of law. Most exceptions to the hearsay rule necessarily implicate an interruption of the right of confrontation. That fact alone does not bar use of otherwise relevant, material evidence which satisfies sufficient guarantees of trustworthiness and reliability.

In the present case, Wilson sought to justify his criminal activity by claiming a special relationship with the CIA. It need hardly be noted that the CIA operates and seeks to operate with a minimum public profile. Its internal workings and activities are not made public and evidence about such is carefully guarded, as it should be. The apparent dilemma presented by the instant case was real. The government was called upon to prove the negative, that Wilson was not directly or indirectly associated with the CIA, or acting with the CIA's knowledge and approbation when he ar-

ranged and concluded the C–4 ·shipment from Houston to Libya. The approach taken by the government was to first offer a live witness with personal knowledge of CIA records, subject to what the government perceived as reasonable security limitations, and, when blocked by defendant's objection, to offer the certification of the lack of record evidence, as provided for by the Rules of Evidence. This procedure was not constitutionally impermissible.

■ Wilson's complaint that the affidavit was procedurally defective is not persuasive. Although preferable, the affidavit need not contain, as an essential element, the words that "diligent search failed to disclose the record ...," Fed.R.Evid. 803(10); *United States v. Harris*, 551 F.2d 621 (5th Cir.1977). It suffices that the affidavit, and all relevant circumstances, reflect an adequate search. In this regard, the determination by the district court will be accorded wide discretion. There is no merit to this assigned error.

### 13. *Unconstitutionality of CIPA*

Wilson contends that CIPA is unconstitutional on its face and as applied because it: (1) is void for vagueness, (2) violates the privilege against self-incrimination, (3) violates the confrontation rule, and (4) permits unilateral appeal by the government. Consistent with the court's obligation to eschew deciding unnecessary points of constitutional law, we do not address these constitutional complaints. *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). We perceive no significant evidence which was allowed or disallowed solely on the basis of CIPA. Certain classified material was ruled out as irrelevant and immaterial, certain subpoenas duces tecum were quashed because they were overbroad, directed to material previously ruled inadmissible, or tardily served. The questions posed by this assignment of error remain for another day for this court.

### 14. *Brady Violation*

■ Appellant claims a *Brady* violation, suggesting that the government had infor-

mation about associations of certain people with the CIA which would have materially aided Wilson's defense. Our review of the record, with particular emphasis on the classified filings, briefs and oral arguments, satisfies us beyond peradventure that no *Brady* violation occurred.

Finding no reversible error in any assignment of error, and none as a consequence of the cumulative total of the assignments, we AFFIRM.