UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald MALSOM & Tencom Corporation, Defendants-Appellants.

Nos. 83–2958, 84–1269.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1985.

Decided Dec. 5, 1985.

As Amended Dec. 20, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 6, 1986.

**1230**

Michael B. Nash, Chicago, Ill., Myles J. Ambrose, O'Connor & Hannan, Washington, D.C., for defendants-appellants.

William J. Cook, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and DUMBAULD, Senior District Judge.*

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

COFFEY, Circuit Judge.

The defendants, Tencom Corporation and Donald Malsom were convicted, by a jury, of attempting to export, exporting, and conspiring to export, implements of war and other controlled commodities from the United States of America to Libya without having obtained the necessary export licenses in violation of 22 U.S.C. § 2778 and 50 U.S.C.App. § 2410(a). The defendants were also convicted of filing false statements with the federal government in violation of 18 U.S.C. § 1001. Malsom was sentenced to 5 years imprisonment and fined $120,000, while Tencom was fined $4,187,-259. Nedim Sulyak, the president of Tencom, and Colonel ElYazgi of the Libyan Air Force were also indicted but have been outside the jurisdiction of the United States and thus have not been brought to trial. We affirm.

**I**

Tencom, a corporation engaged in the sale of new and used aircraft equipment since 1978, is located in Northbrook, Illinois. This small company employed only four persons—a president, Nedim Sulyak, who was responsible for the company's sales, a general manager, Malsom, who was responsible for the shipment of airplane parts, and two secretaries. The company advertised itself as a supplier of commercial and aviation equipment, "Specializing in procurement of all types of military equipment."

The record reveals that in October, 1980, Tencom was on the verge of bankruptcy. Shortly thereafter, Sulyak met with a Colonel ElYazgi, masquerading as a representative of the United African Airline, but who in fact was an officer in the Libyan Air Force and was responsible for procuring airplane parts for the military. Sulyak obtained a contract for $20 million to sell aircraft parts to Libya, including parts for use on the C–130 Hercules cargo transport

planes and Chinook CH–47 helicopters owned by Libya. In 1971, Libya purchased eight C–130's with identification tail numbers ranging from 111 to 118 and twenty CH–47 Chinook helicopters from Lockheed Corporation.

Before the replacement parts for the C–130 and CH–47 could be shipped overseas, Tencom was required to obtain the required export licenses. In order that the United States might control shipments of military goods or goods with potential military application to foreign countries, Congress enacted laws requiring that shipments of such goods be registered with either one of two government agencies— the State Department or the Commerce Department. Specifically, the State Department Office of Munitions Control ("OMC") was responsible for the licensing and exportation of items specifically designed for military use or purposes. If an exporter wishes to ship any item listed on the OMC's Munitions Control List ("MCL"), the exporter must obtain the required license from the OMC. *See* 22 U.S.C. § 2778 and 22 C.F.R. 127.01. The C–130, the Chinook CH–47, and the parts specifically designed for use on these aircraft are subject to the licensing requirements of the OMC.

Manufacturers who construct aircraft designed for military purposes oft times also design a civilian version of the aircraft for commercial use. In this case, the civilian counterpart of the C–130 Hercules is the L–100; the only significant difference between the two aircrafts is that the C–130 has a parachute exit door. Export of aircraft parts designed and manufactured to be interchangeable between these two planes and thus capable of "dual use," requires a license issued by the Commerce Department Office of Export Administration ("OEA"). *See* 50 U.S.C.App. 2410(a), 15 C.F.R. 372.1(b). A license from OMC or OEA is not required to ship other minor parts which can be used on any number of commercial items. These parts can be shipped under the general destination ("G–Dest") label on the Shipping Export Decla-

ration form ("SED"). The Shipping Export Declaration form is attached to all export shipments leaving this country with a value greater than $500.00, and informs the custom agents of the shipments' contents; the custom agents collect these forms as the goods leave the country.

It was established at trial that after Tencom commenced business in 1978, Sulyak applied to the State Department for an export regulation number and in return received this number and a package of materials explaining the United States export licensing requirements. Tencom, however, never applied for a State or Commerce Department license for their shipments of airplane parts to Libya. Since 1978, the United States has prohibited the sale of military aircraft, their parts and parts with potential military use to Libya because of the past and current policies and actions of Libya. Thus, if Tencom had applied for licenses to ship C–130 and CH–47 parts listed on the MCL or CCL, its request without a doubt would have been denied.

The record reveals that Tencom shipped goods to various Libyan agents from October 1980 until September 1981, when the U.S. Customs Service seized a Tencom shipment bound for Libya. The shipments had followed one of two routes. Tencom shipped many of the items directly to Libya from O'Hare International Airport in Chicago, Illinois; the SEDs attached to the shipments stated that the parts were destined for the "United African Airlines Tripoli International Airport, Libya" and described the aircraft parts as "non-military." [1] At trial, it was established that the United African Airline ("UAA"), Tencom's alleged client for these shipments, did not pay Tencom for these parts; rather, Tencom directly received the payments from either the Libyan Military Procurement Office or the Libyan Embassy in Washington. In fact, the telexes submitted at trial demonstrated that Tencom had, on several occasions, directly telexed requests for payments to a Colonel ElYazgi

---

**1.** Forty of the sixty shipments of aircraft parts were made directly to Libya.

at the telex number of the Libyan Air Force at Okba Air Base in Tripoli, Libya.

Tencom also shipped parts to West Germany, with their ultimate destination being either Libya or Venice, Italy, where Libya had its C–130 fleet serviced at Aeronavali, an aircraft maintenance company. Aeronavali had agreed to repair the fleet of C–130s for the Libyan Air Force; however, Aeronavali would not supply the replacement parts. To obtain these parts, Luigi Scarpa, an employee of Aeronavali, prepared lists of the needed replacement parts that he transmitted via telex to a Colonel ElYazgi. ElYazgi would then order and obtain the airplane replacement parts.[2] The evidence revealed that Sulyak, during one of his sales trips to Europe, met with ElYazgi and a man named Heinz Fuch, an account executive with Aerodienst Company, a small jet aircraft repair facility located in Nuremberg, West Germany. According to the plan developed at this meeting, Tencom would ship parts to Aerodienst which would in turn arrange for the transfer of the parts to one Luigi Scarpa at Aeronavali in Venice, Italy. The Shipping Export Declaration form for these shipments leaving the United States listed West Germany as the "Point of Final Destination," and not Aeronavali in Venice, Italy. The Shipping Export Declaration form also designated as "non-military," the replacement parts on the SED. During the time period specified in the indictment, from October, 1980 to September, 1981, Tencom shipped airplane parts to Aerodienst, through West Germany, for the repair of two C–130s with tail numbers 112 and 118.[3] Tencom received replacement part orders for the C–130 tail number 118 from November, 1980 through April, 1981

and replacement orders for C–130 tail number 112 from April, 1981 through September, 1981. Spare parts for tail number 112 were ordered via telexes exchanged between Scarpa, at a public telex in Venice, and Malsom, at Tencom.

Other large shipments were sent through West Germany and on to Libya. In February, 1981, Tencom shipped five C–130 engines via Fritz Air Freight, an export shipper located in Chicago, to Aerodienst in West Germany and its freight forwarder, Emo-Trans, which in turn shipped the engines to Libya. John Theodore, a friend of Malsom who worked at Fritz Air Freight, testified that he had cautioned Malsom about dealing with Libya and had told Malsom that Fritz Air Freight would not ship any parts to Libya. In August, 1981, Tencom also shipped two C–130 engines and airplane propellers to Emo-Trans in West Germany. Tencom's internal invoices listed Libya as the ultimate destination for both shipments, yet the SED stated that Emo-Trans in West Germany was the point of ultimate destination for the engines.[4] At trial, Malsom admitted that Emo-Trans was simply a freight forwarder.

At trial, the telexes received in evidence established extensive contacts between Tencom and Libyan airforce personnel during the time Tencom was shipping parts to Libya. These telexes were made under the designation "Pro Libya" and were to and from Colonel ElYazgi, the person charged with procuring parts for Libyan Air Force, and Colonel Hanish, the Director of Military Procurement for Libya. Malsom admitted at trial that he had worked on at least one of the orders submitted via telex

---

**2.** Communications between Aeronavali and Libya were relayed by telex on number 20210 or number 20433. The telex number 20210 was assigned to the Libya Director of Military Procurement, while the number 20433 was assigned to Colonel ElYazgi's office at Okba Air Base in Tripoli, Libya.

**3.** It was established at trial that airplane tail identification numbers beginning with a letter designated a commercial aircraft while a tail

number beginning with an arabic numeral designated a military aircraft.

**4.** Malsom disputes the government's contention that he told Theodore that the point of ultimate destination was Emo-Trans in West Germany. A logical inference from the evidence at trial, however, is that Malsom must have told Theodore that West Germany was the ultimate destination for Theodore to properly complete the SED form.

which was signed, the "Director of Libya Military Procurement."

The government further established that payments for all of these parts came from various Libyan agencies, and that not one payment was ever received from the account of United African Airline. The financial rewards for Tencom were of course substantial as the payments from Libya created a complete reversal of Tencom's financial fortunes, rescuing the company from the brink of bankruptcy. The Libyans paid approximately $14 million, from January 1, 1981 through September 4, 1981, for the airplane parts, principally through wire transfers that resulted in a profit to Tencom in the amount of approximately $3 million. As a result of this financial bonanza, Sulyak received a $300,-000 bonus and Malsom recieved a $100,000 bonus, and also the firm was able to purchase a Mercedes automobile and a jet aircraft.

On appeal, Tencom and Malsom assert that the evidence failed to disclose the necessary criminal intent to violate the export laws. The defendants, individually and jointly, also raise a plethora of other issues including their contention that the district court erred in failing to suppress evidence seized from Tencom's headquarters, and in failing to order a mistrial as they allege they were unable to receive a fair trial due to the vast amount of news media coverage of Libyan military activities at the time of the trial.[5]

## II

### A. Sufficiency of the Evidence

█ It is well established that our standard for reviewing the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendants guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Perry,* 747 F.2d 1165 (7th Cir.1984); *United*

*States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). The defendants do not contend that the airplane replacement parts shipped overseas to Italy and Libya did not require export licenses, either from the OMC or the Commerce Department. Rather Tencom, and Malsom in particular, argue that the government failed to establish the necessary criminal intent to violate the licensing laws. Whether or not the necessary intent was established is in all cases a question for the trier of fact to resolve. Although the defendants raise a number of arguments disputing inferences to be drawn from the record, we limit the number of issues addressed to only those that merit discussion.

### 1. Criminal Intent

█ Malsom argues that he shipped most of the airplane parts from O'Hare airport directly to Libya, listing Libya as the point of final destination, and his openness in shipping these parts from this country demonstrates his lack of criminal intent to violate the export licensing laws. However, the shipments to Libya involved the smaller airplane parts and were described on the SEDs as non-military and shipped as "G–Dest." The jury might very well have found that Malsom knew that the smaller items described as non-military and shipped under a "G–Dest" designation would not be checked by customs agents if shipped directly to Libya. Specifically, the government introduced evidence that Malsom previously worked for Air France in its shipping department at O'Hare Airport and, from his previous employment experience at Air France, knew that Customs Inspectors rarely inspected out-going cargo. Moreover, the jury also could have found that Malsom knew that in order that the shipments avoid detection Tencom would have to ship the larger, more noticeable items, such as the five C–130 engines valued at more than $2 million, through West Germany instead of directly to Libya. The logic of this scheme becomes more apparent

5. The defendants requested that the court, on several occasions, declare a mistrial.

ent when one considers that the defendants also shipped the replacement parts for the Libyan airplanes being repaired at Aeronavali through West Germany instead of directly to Aeronavali in Venice, Italy. From a cost efficiency point of view, it made no sense to use this circuitous shipment route as it involved more cargo handling and thus was more expensive, unless the defendants were doing all in their power to avoid detection.

Malsom and Tencom next argue that many of the C–130 and L–100 airplane parts were interchangeable and that the licensing requirements for these parts were so complex and confusing that a layman could not determine whether or not a license was required for the exportation of these parts. To support this argument the defendants note that the government experts at trial disagreed as to whether the parts listed in several of the counts of the indictment required either a State Department license or a Commerce Department license. Where these experts disagreed as to the licensing requirements for a specific part—whether the part required a State or Commerce Department license—the district court dismissed that particular count of the indictment. The evidence discloses that this is clearly not a case of license confusion, but a case of license avoidance.

It was established at trial, that Malsom was placed on notice that licenses were required (either OMC or Commerce Department licenses) for these shipments, yet he still failed to make application to the government for a valid or proper export license. Specifically, on November 20, 1980, at approximately the time of the commencement of aircraft parts shipments to Libya, Malsom attempted to export a C–130 nose landing gear to France under a general destination license. Malsom was informed by an Ed Pluemer of World Commerce Services, an export shipper, that such a piece of equipment required an export license from the Commerce Department; Malsom applied for this license in November, 1980. Yet the very next month, Malsom shipped the same piece of equipment to Libya without applying for a license. Malsom argues that when he was told by Pluemer that the part shipped to France needed a license, he called the Commerce Department and talked to an agency official, supposedly a man named Jim Martin, who advised him that "dual use" replacement parts did not require a license. Malsom failed to document this phone call and the jury was free to believe or discredit this testimony. Nevertheless, Malsom admitted that in another conversation with Martin earlier that same day he was told that the export of airplane parts are reviewed on a case-by-case basis; the evidence discloses that Malsom made no attempt to submit the license application to Commerce Department for review.

■ Malsom was also explicitly warned by a friend during the period he was shipping the replacement parts of the risk involved in shipping aircraft parts to Libya. John Theodore, a friend of Malsom who worked as an agent for Fritz Air Freight, testified that he had warned Malsom on approximately ten occasions during 1980 and 1981 against shipping parts to Libya. In April, 1981, he also provided Malsom with a Bureau of National Affairs article that discussed a Commerce Department investigation of illegal L–100 airplane part shipments to Libya. Finally, telexes exchanged between Libya and Tencom, which were seized from Tencom's offices, were often addressed to or from the "Director of Military Procurement." Malsom admitted at trial that he had personally filled the order for parts listed on one of these telexes. In spite of these warnings, Malsom and Tencom continued to risk shipping parts to Libya, obviously because of the financial rewards. Since the evidence at trial discloses that Tencom and Malsom were warned on numerous occasions that export licenses were required before the aircraft parts could be shipped overseas, we hold there was more than sufficient evidence for the jury to conclude that the defendants knew that the aircraft parts that were shipped to Libya required licenses and the reason they failed to apply for the licenses was because they were well

aware that these shipments violated the United States laws and regulations.

## 2. False Statements

■■■ Malsom was also convicted of filing false statements with the government, in violation of 18 U.S.C. § 1001, when he caused the export shippers to fraudulently list West Germany as the final destination of these aircraft parts when in fact he knew these airplane parts were bound for Libya. A person violates section 1001 if he knowingly and willfully makes a material false statement on an official document submitted to a governmental agency. *See, e.g., United States v. Carrier,* 654 F.2d 559, 561 (9th Cir.1981). Malsom argues that the SED form itself is not material as demonstrated by the fact that the government is indifferent to the information contained on the form. Malsom points out that forty of Tencom's shipments were allowed to leave the United States despite the fact that Tripoli was listed as the final destination.[6] The test for materiality "is whether the false statement has a tendency to influence or is capable of influencing a federal agency." *United States v. Brack,* 747 F.2d 1142, 1147 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985). According to the evidence presented at trial, the Commerce Department uses the SED form to compile export statistics and to aid in the enforcement of the export laws. Clearly, the government relies on these forms and thus Malsom's suggestion that the SED form itself is not material is without merit.[7]

## B. Suppression of the Evidence

The defendants next argue that the district court erred in denying their motion for a more extensive hearing on the veracity of the affidavit filed by customs agent Barkman in support of the search warrant issued for Tencom's office.[8] The defendants also argue that Barkman's affidavit is so inherently unreliable that the evidence seized during the search of Tencom's office should be suppressed.

■■■ When challenging a search warrant on the grounds that the underlying affidavit contains material misstatements of fact, the defendant must establish by a preponderance of the evidence "that the statements contained in the affidavit were indeed false and were intentionally included by the affiant, or with reckless disregard for the truth, and that if the false statements had not been recited in the affidavit, the magistrate would have been unable to find the probable cause necessary for the issuance of the search warrant." *United States v. Gaertner,* 705 F.2d 210, 212 (7th Cir.1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984) (*citing Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)). Both the magistrate and the district court found that the statements made by Barkman in his affidavit were not intentionally untruthful and that even eliminating the allegedly false statements contained in the affidavit, the affidavit was still sufficient to establish probable cause to search.

■■■ Tencom and Malsom challenge several portions of Agent Barkman's affidavit as being knowingly and intentionally untruthful. One of the supporting documents attached to his affidavit was an anonymous letter dated February 9, 1981, stating that Tencom was supplying C–130

---

6. Since these shipments did not falsely identify the shipment's final destination point, Malsom was not charged for violating 18 U.S.C. § 1001 for these shipments.

7. The SED carries a warning that any false statements on this form can subject a person to criminal prosecution under 18 U.S.C. § 1001. Thus, Malsom was clearly put on notice that in causing the export shippers to state the final point of destination as West Germany rather than Libya, Malsom risked criminal prosecu-

tion. As previously discussed, the telexes exchanged between Tencom and Libya and Tencom's own invoices listing Libya as the point of final destination clearly established that Malsom knew that these parts were in fact destined for Libya and not West Germany.

8. Many of the invoices, telexes and documents that were seized during the search of Tencom's office conducted on September 11, 1981, were introduced at trial.

military aircraft parts to a Captain ElYazgi, a member of the Libyan Air Force. Attached to this letter was a Tencom packing slip listing several C–130 parts sold to the United African Airlines. In paragraph 2 of his affidavit, Agent Barkman states that "OMC has not been able to determine who had sent the document." The defendants contend that the Government knew in July, 1981, that the source of the information was a CIA renegade agent named Edwin Wilson, but that the government intentionally failed to disclose that Wilson was the source of the information contained in the affidavit. Agent Barkman stated at the suppression hearing that he was told by FBI Agent Flanagan, in August 1983, that the government had interviewed an Edwin Wilson who informed the government that Tencom had a $50,000 contract with Libya to supply aircraft parts. Barkman, however, testified that while he heard that the alleged author of the letter was Wilson, Agent Flanagan never mentioned to him that Wilson was in fact the author of that letter. The magistrate found that Barkman's failure to disclose the unsubstantiated rumor in the affidavit was not erroneous as an affidavit is to disclose facts, nor rumors, and at the time Barkman was not in possession of any solid evidence to link the letter to Wilson. The magistrate certainly was in the best position to assess Barkman's credibility and his finding will not be disturbed absent a showing that its decision is clearly erroneous. *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Our review of the record of the suppression hearing convinces us that the magistrate's decision is clearly not erroneous.[9]

 The defendants also challenge paragraph 4 of Barkman's affidavit where he stated that:

"Investigation in the Chicago area in August, 1981 by your affiant disclosed that in fact on about February 26, 1981, Tencom Corporation of Northbrook, Illinois, exported 17 cartons of aircraft parts and accessories valued at $249,030.00 from O'Hare International Airport to Tripoli, Libya through Paris, France by way of Air France and United African Airlines. *Your affiant learned from examination of the export documents and cargo manifest* and discussions with Sam Mobley of Lockheed-Georgia of Marietta, Georgia *that the Tencom export described here required, but did not have, a validated export license.*" (Emphasis added.)

The defendants contend that Barkman could not have learned of the part numbers listed in paragraph 4 from the export documents since an Air France official testified that Air France did not retain any documents in its files that would disclose this type of information. Thus the defendants argue that the information must have come from Ben Wilson, and that Barkman admitted at the suppression hearing that the information may have in fact come from Wilson via Agent Flanagan. Whether or not Barkman sought to intentionally mislead the magistrate by not identifying the source of the information contained in paragraph 4 is of no consequence since both the magistrate and the district court found that, even ignoring paragraph 4, the affidavit when read in its entirety still recited grounds sufficient to justify the issuance of a search warrant. We agree.[10] Under the totality of the circumstances test

---

**9.** We note that an affiant has no obligation to disclose the identity of unnamed informants. *See McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). We recognize that the issue here is not the identity of the author of the letter disclosing details of Tencom's involvement with Libya; rather, the issue is whether the affiant, Agent Barkman, intentionally attempted to mislead the magistrate as to the sources of his information for Tencom's activities.

**10.** We do not, however, concede that Barkman's statements in paragraph 4 were intentionally misleading. Rather, even assuming that they were misleading to a degree the affidavits still contain sufficient information to justify a finding of probable cause to issue the search warrant.

that was reaffirmed in *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the magistrate is simply to make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' a person supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. at 2332. The other paragraphs contained in Barkman's affidavit fully support the validity of the search warrant. For instance, in paragraph 7, Barkman states that he personally observed several Tencom's containers being prepared for shipment from O'Hare Airport and that these containers described their contents as non-military commercial aviation equipment. In paragraph 8, Barkman states that he spoke with a Clyde Bryant of the OMC who advised him that Tencom had obtained a registration number from OMC that must accompany the shipments and that Tencom was not authorized to ship those parts that were being prepared for shipments from O'Hare airport. Further, in paragraph 10, Barkman states that he spoke with an Agent Belt of the Commerce Department who advised Barkman that replacement parts for planes "known as 'C–130's' and 'L–100'" must be licensed by the Commerce Department and that the parts described by Barkman to Agent Belt required a Commerce Department license. Finally, in paragraph 15, Barkman observed that the export documents for these shipments stated that a "West Germany company" was listed as the "end user," but that his source at U.S. Customs informed Barkman that this company was simply a freight forwarder and thus could not be the "end user" of the airplane parts.

The defendants nitpick with several of the statements made in these paragraphs; for instance in paragraph 8 the defendants note that Barkman "states that his source at OMC, Clyde Bryant, told him the C–130 military aircraft parts must be specifically licensed by OMC...." Malsom argues that this is misleading as both Bryant and

Barkman knew that over ninety-five percent of the parts for the C–130 are interchangeable with the L–100 and thus many of these parts were not subject to OMC licensing, but rather Commerce Department licensing. However, in paragraph 10, Barkman discusses the interchangeability of these parts between the L–100 and C–130 and the fact that these parts are subject to Commerce Department licensing. A proper reading of paragraph 8 reveals that it refers only to C–130 parts used exclusively for military purposes and that licenses for these parts are required by the OMC. As stated in *Illinois v. Gates:*

> "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' ... '[a] grudging or negative attitude by reviewing courts towards warrants,' ... is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; '*courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than commonsense manner.*'" (emphasis added).

*Gates,* 462 U.S. at 236, 103 S.Ct. at 2331 (citations omitted). We refuse to entertain the defendants' invitation to interpret Barkman's affidavit in a nitpicking, hypertechnical, nonsensical manner.

As the magistrate and district court found, the affidavit disclosed sufficient detail, even after redacting paragraph 4, to support a finding of probable cause to issue a search warrant. Barkman's affidavit clearly sets forth the fact that Tencom was preparing to ship parts without the required export licenses and that the shipping documents misrepresented the ultimate destination of these parts. Thus, the defendants in this case have failed to establish the second prong of the *Franks v. Delaware* test—here, even absent the allegedly intentional false statement made in the affidavit, the affidavit established the necessary probable cause to issue the search warrant.

 Malsom next claims that the district court erred when it failed to review the transcript of the suppression hearing after the defendants filed objections to the magistrate's recommendation that the evidence seized from Tencom's office not be suppressed. The Federal Magistrate's Act provides that:

"A judge of the court shall make a de novo determination of those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made."

28 U.S.C. § 636(b)(1) (1982). Malsom relies on *United States v. Elsoffer*, 644 F.2d 357 (5th Cir.1981), a Fifth Circuit decision interpreting this section to mean that "an appellate court must be satisfied that a district judge has exercised his non-delegable authority by considering the actual testimony, and not merely by reviewing the magistrate's report and recommendations." *Id.* at 359. In this case, Malsom contends that the district court failed to read, or at least the record is not definite one way or the other as to whether or not he in fact did read the transcript of the suppression hearing. Specifically, Malsom relies upon the following colloquy between the district court and his defense counsel where, in response to the court's inquiry as to whether the defendant was requesting an entirely new suppression hearing, defense counsel stated:

"Judge, I certainly think that at the very least the transcripts must be read, but in this case a hearing should have been held by the court, it would seem to me. I was under the impression at the very least that your Honor would consider the matter de novo on the basis of the facts deduced at the hearing, and especially in light of the fact with the allegations with the regard to the testimony of Agent Barkman."

The court refused the defendants' request for a separate hearing before the district court by stating, "you have a right to disagree Mr. Nash. I'm just telling you what my ruling is." Malsom argues that this conversation is sufficiently ambiguous to cause concern as to whether the district court ever read the hearing transcript since the court did have the opportunity to affirmatively state that it had read the transcript, yet failed to do so. Essentially, the defendant cites the single mention of the word "read" in the quoted passage from his defense counsel's statement to the court and attempts to create the aura that the district court, because it did not directly respond to this specific assertion in counsel's question, failed to read the record of the suppression hearing. When this colloquy is read in its proper context, however, it clearly establishes that the court was responding to the defendants' request for another suppression hearing and was not in any way even attempting to respond to any assertion that he had not read the trial transcript. Moreover, in ruling on the motion to suppress Agent Barkman's statements, the district court in fact noted that it had read the magistrate's report and recommendations, and the exceptions filed to the magistrate's report. Further, the district court noted its familiarity with Agent Barkman's testimony at the suppression hearing when the court stated, "[w]e have already heard Agent Barkman testify up in court at trial. He confirmed much of the testimony which he gave before the magistrate. We find no reason to set aside the magistrate's opinion of Barkman's credibility." Thus, this court is satisfied that the district court did in fact review the transcript of the suppression hearing concerning Agent Barkman's testimony.

### C. Sixth Amendment Right of Confrontation

The defendants next contend that their constitutional right to confront and cross-examine witnesses was denied when the district court refused to grant a mistrial after one of the government witnesses, George Mosher, died during the trial before the defendants had the opportunity to cross-examine him. The court explained to the jury that Mosher was no longer avail-

able as a witness [11] and that his testimony was incomplete as he had not been cross-examined. The court then instructed the jury that the court would "strike all of his testimony and instruct you to disregard it completely. I don't want you to even discuss his testimony among yourselves because you should wipe it out of your minds, and give it no credence or any effect whatsoever...."

On August 3, 1983, George Mosher, who had worked for a Tencom subsidiary for part of 1981, testified during the government's case-in-chief that in the fall of 1980 he had warned Sulyak that export licenses were needed for the sale of whole military parts outside of the United States. Mosher also testified that he warned Sulyak in February, 1981, that Sulyak was "sticking his neck out" if he was selling aircraft to the Libyans. In 1981, Tencom was also preparing to ship aircraft parts to Peru. Mosher testified that he told Malsom, in response to Malsom's inquiry, that State Department approval was required in order to sell military aircraft to Peru. After this brief testimony, consisting of only twelve pages of transcript, the district court retired for the day. That night George Mosher died of a heart attack in his hotel room.[12]

 The defendants argue Mosher's testimony was extremely damaging since it reflected directly upon the defendants' knowledge that, in selling aircraft parts to Libya, they risked criminal prosecution. Moreover, the defendants argue that anything less than a full cross-examination of Mosher would deny the defendants' Sixth Amendment right to confront witnesses. We can perceive no Sixth Amendment vio-

lation where the district court struck Mosher's testimony and took pains to instruct the jury to disregard it. *See United States v. Seifert*, 648 F.2d 557, 561 (9th Cir.1980) (*citing United States v. Williams*, 626 F.2d 697, 702 (9th Cir.1980)). *Cf. United States v. Phillips*, 664 F.2d 971, 1027–28 (5th Cir.1981). Since there was no Sixth Amendment violation, the defendants' argument is that the district court abused its discretion in refusing to grant a mistrial after Mosher's death as the jury once having heard the damaging testimony would be unable to dismiss the testimony from their consideration of guilt. As the district court noted, however, Mosher's testimony was "primarily cumulative," involved only twelve pages of testimony, and "because of the length of trial and the voluminous amount of documents and testimonial evidence submitted by the government on what was basically a simple question of fact [i.e. the defendants' intent to break the law], we [sic] have no doubt that the jury did not give any appreciable weight to Mr. Mosher's testimony and it in fact had no need to consider it." The district court properly noted that the government introduced extensive and cumulative evidence that the defendants had knowledge that they were required to obtain export licenses for the airplane parts and that shipments of these aircraft parts to Libya would not be allowed because of this country's acrimonious relationship with Libya. Thus, we hold that the inability of the defendants to cross-examine Mosher because of his untimely death did not violate the Sixth Amendment and that the district court did not abuse its discretion in refusing to order a mistrial.[13]

11. The court did not inform the jury that Mosher had died.

12. A story published in the Chicago *Sun-Times* on August 8, 1983, under the headline "Shhhh! there is a body in Room 717" reported the death of George Mosher. This article will be discussed in the section of this opinion dealing with unfair publicity surrounding the trial.

13. Because we hold that the district court did not abuse its discretion in refusing to grant

defendants' motion for a mistrial on the grounds that they were unable to cross examine Mosher, we need not reach the government's argument that there were sufficient circumstantial guarantees of trustworthiness surrounding Mosher's testimony as to permit this evidence to remain in the record. *See United States v. Boulahanis*, 677 F.2d 586, 589 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. West*, 574 F.2d 1131 (4th Cir.1978).

### D. Unfair Publicity

The defendants contend that they were denied a fair trial because of the amount of publicity during the trial relating to Libyan military activities and because of an article in the Chicago *Sun-Times* detailing the death of the witness, George Mosher. Specifically, while the trial was in session in the early weeks of August, 1983, there were a series of articles in Chicago's two major daily newspapers describing the Libyan invasion of Chad and the political and military response by the United States to that invasion. Also on August 8, 1983, an article appeared in the Chicago *Sun-Times*, under the headline "Shhhhh! there's a body in Room 717," that discussed the death of George Mosher. This article noted that George Mosher was a witness for the government against Tencom Corporation. The article also stated that Mosher was a government informant enrolled in the Federal Witness Protection Program under an assumed name, all of which was untrue. Finally, the article observed that the government had investigated his death for foul play, but concluded that Mosher had died of natural causes.

 In *United States v. Thomas*, 463 F.2d 1061 (7th Cir.1972), this circuit discussed the measures that a court should take when confronted with potential prejudicial publicity during a trial.

> "[W]hen apprised in a general fashion of the existence of damaging publicity, the district court is only called upon to 'strongly and repeatedly [admonish] the jury throughout the trial not to read or listen to any news coverage of the case'.... When the publishing of specific examples of inadmissible evidence is brought to the court's attention, further investigation is required to determine juror exposure to it:
>
>> Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond af-

firmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity."

*Thomas*, 463 F.2d at 1063 (*citing Margoles v. United States*, 407 F.2d 727, 733, 735 (7th Cir.1969)); *see also United States v. Wilson*, 715 F.2d 1164 (7th Cir.1983). In this case, the record establishes that the district court frequently warned the jury during the trial that Libya and its activities must not influence the jury's decision. Specifically, during the initial voir dire, the court inquired of the panel of potential jurors as to their feelings about the Libyan government; the court further warned that the political views of people who deal with Libya were not at issue in the case. During the course of the trial, the court admonished the jury on a daily basis to refrain from reading any articles in the newspapers or watching or listening to any news accounts related to Libya. When the defendants brought a newspaper article specifically discussing the Tencom case to the court's attention, the court voir dired each juror individually in its chambers to determine if any juror had seen the article; each juror stated that he or she had not seen any article relating to the trial. When an article appeared discussing George Mosher's untimely death, the district court again voir dired each juror, individually in his chambers, without specifically mentioning the contents of the article, and inquired of each juror if any juror had seen any article in the newspaper discussing the case; again each juror stated he or she had not seen the article. When the court discovered that one juror may not have been entirely truthful in responding to these inquiries, the district court removed her from the jury panel. Finally, during the trial court's closing instructions to the jury, the judge again emphasized the importance of disregarding any publicity about the case or Libya.

Because of the instantaneous news delivered through television, radio and newspapers, news media coverage of Libyan activities was a nationwide event at the time of

this trial. This country's relationship with Libya and its dictator Colonel Khadafy were and still are, to put it mildly, strained. In light of this country's acrimonious relationship with Libya, the only way the defendants could have avoided a trial with the potential for this type of prejudice was to have no trial at all. However, as the district court noted: "The jury was isolated from this publicity insofar as it was humanly possible to accomplish this, and we [sic] found no reason to believe that the jurors did not follow the court's instructions conscientiously, with the exception of one juror whose participation was terminated out of an abundance of caution." After a review of the record and the district court's efforts to shield the jury from the potentially prejudicial publicity surrounding this case, we are convinced that the verdict was not tainted by articles in the Chicago press discussing Libya and the specifics of this trial. Thus, the defendants' argument that they were denied a fair trial is at best a red herring.

E. Other Issues

■■■ Malsom next argues that his Fifth Amendment right to be indicted by a grand jury was violated as there was insufficient evidence presented to the grand jury concerning the licensing requirements of the airplane parts referred to in the indictment. Specifically, Malsom argues that the government failed to introduce evidence as to the licensing requirements for Counts 2 through 5, 8, 11, 17 through 19, 21, 22, 27 and 28. A grand jury is afforded wide discretion in its investigation of criminal activity, and thus our scope of review of a grand jury proceeding is *extremely* narrow. Thus, "[t]he grand jury may draw its information from a wide variety of sources, and 'the validity of an indictment is not affected by the character of the evidence considered.'" *United States v. Wilson,* 732 F.2d 404, 409 (5th Cir.1984) (*citing United States v. Calandra,* 414

U.S. 338, 343–45, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974)); *see United States v. Roman,* 728 F.2d 846, 854–55 (7th Cir. 1984), *cert. denied,* —— U.S. ——, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). "Courts have consistently refused to dismiss an indictment when the challenge primarily questioned the quality or quantity of the evidence before the grand jury." *Wilson,* 732 F.2d at 409–10 (*citing Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)); *see United States v. Flomenhoft,* 714 F.2d 708, 711 (7th Cir.1983). In this case, Agent Barkman presented a summary of the government charges, listing by count in the indictment the invoice number, the part number of the aircraft part and the applicable licensing requirement.[14] His testimony was more than sufficient to support the indictment returned by the grand jury.

Finally, Tencom argues that the prosecutor's inflammatory statements during closing argument denied the defendants a fair trial. From our review of the prosecutors' closing remarks, we have failed to discover any statements made by the prosecution that might even remotely be construed as unduly prejudicial to the defendants. Thus, we hold that Tencom's claim of unfair prejudice is absolutely without merit.

The convictions of Tencom Corporation and Donald Malsom are AFFIRMED.

---

**14.** It does not matter that Agent Barkman received his information concerning the licensing requirement from another government source as a grand jury may rely on hearsay information to support its indictment. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).