**UNITED STATES of America,**
**Plaintiff,**

v.

**Edwin Paul WILSON, (Ancillary Civil Action H–97–831) Defendant.**

**No. CR.H–82–139.**

United States District Court,
S.D. Texas.

Oct. 27, 2003.

Edwin Paul Wilson, White Deer, PA, pro se.

David Adler, Attorney at Law, Bellaire, TX, for Defendant.

Paula C. Offenhauser, Fred H. Dailey, U.S. Attorneys Office, Houston, TX, Robert J. Erickson, Arlene Reidy, Mark Bonner, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

### Opinion on Conviction

HUGHES, District Judge.

1. *Introduction.*

Twenty years ago, the government tried a former Central Intelligence officer for exporting explosives to Libya. His defense was simple. He said he was still working for the Company. The government refused to disclose records of his continued association with the agency. When he presented witnesses to his contacts after the end of his formal employment, the government convinced the judge to admit an affidavit from a principal CIA official to the effect that there were, with one minor exception, none—zero. There were, in fact, over 80 contacts, including actions parallel to those in the charges.

■ The government discussed among dozens of its officials and lawyers whether to correct the testimony. No correction was made—not after trial, not before sentencing, not on appeal, and not in this review. Confronted with its own internal memoranda, the government now says that, well, it might have misstated the truth, but that it was Wilson's fault, it did not really matter, and it did not know what it was doing. Because the government knowingly used false evidence against him and suppressed favorable evidence, his conviction will be vacated.

This opinion refers only to the part of the record that the government has reluctantly agreed may be made public. It does not attempt to recount even that limited range of data in its entirety; the governmental deceit mentioned here is illustrative—not exhaustive.

2. *Background.*

From 1955 through early 1971, Edwin P. Wilson was employed full-time—mostly as an undercover agent—by the United States government through the Central Intelligence Agency. His assignments sometimes required him to establish and use "front" companies to gain access to information and to support CIA operations here and abroad commercially.

Immediately after leaving the CIA—and with the agency's knowledge and approval—Wilson began working for Naval Intelligence on a secret unit, Task Force 157. He again used companies, including one called Consultants International, to mask his intelligence gathering abroad. He worked for the Navy through April 1976.

Throughout this period and beyond, Wilson had professional and personal relationships with CIA employees. The CIA even took over one of his projects.

In January 1978, the United States Attorney for the District of Columbia began investigating Wilson's activities in Libya. (Wilson Mot. to Vacate, Ex. 15.) On April 23, 1980, a grand jury indicted him for shipping explosives to Libya; a jury acquitted him. Following that experience, Wilson took refuge in Libya. He did not leave until June 1982, when an American agent lured him to the Dominican Republic. From there, he was taken to New York City and arrested. A court in the Eastern District of Virginia then convicted him of exporting firearms to Libya without permission and sentenced him to ten years. *See United States v. Wilson*, 721 F.2d 967 (4th Cir.1983) (affirming conviction). In 1983, he was convicted in the Southern District of Texas for similar crimes. After that, a court in the Southern District of New York sentenced him to twenty-five years—to run consecutively with his Virginia and Texas sentences—for attempted murder, criminal solicitation, obstruction of justice, tampering with witnesses, and retaliating against witnesses.

This case is the 1983 conviction.

### 3. *Investigations.*

#### A. 1976–1977.

In September 1976, a former CIA employee told the FBI that a U.S. corporation—possibly controlled by Wilson and another ex-CIA agent—had contracted to sell Libya "one complete educational and vocational training laboratory." The informant believed Libya planned to use the laboratory to train terrorists. The corporation used another former CIA employee as its supplier. With the help of a current CIA employee, ten timers that could be used with explosives were purchased and shipped to Libya. (Wilson Mot. to Vacate, Ex. 13 at 2–3.) When he learned of the allegations, Wilson called Thomas G. Clines, the deputy director of operations for the CIA, and denied that he negotiated the deal. Clines suggested that he meet with the government and share information that he learned while in Libya. (Gov't 0005261–2.) The CIA and the FBI began investigating. The ATF and the U.S. Customs Service, the latter investigating Wilson's involvement in manufacturing and selling surveillance vans to Libya, were soon involved. (Wilson Mot. to Vacate, Ex. 15.)

In April 1977, *The Washington Post* published an article about "ex-CIA officer" Wilson's attempts to smuggle 500,000 explosive timers to Libya the preceding summer. Soon articles appeared on Task Force 157—described as "the U.S. military's only network of undercover agents and spies operating abroad using commercial and business 'cover' for their espionage"—and Wilson's possible knowledge about the murder of Chilean ambassador Orlando Letelier. *See* Bob Woodward, *Pentagon to Abolish Secret Spy Unit*, WASH. POST, May 18, 1977, at A1; *Ex–CIA Agent Agrees to Answer Questions in the Letelier Inquiry*, WASH. POST, Apr. 14, 1977, at A3; Bob Woodward with Ben Weiser, *Ex–CIA Aide, 3 Cuban Exiles Focus of Letelier Inquiry*, WASH. POST, Apr. 12, 1977, at A1; Gov't 0005516.

CIA representatives were called before the House of Representative's Permanent Select Committee on Intelligence to explain. President Ford and the Senate Select Committee on Intelligence were also briefed. (Wilson Mot. to Vacate, Ex. 26.)

Two days after the article about Libya appeared, John Waller, the CIA's inspector general, instructed ten officials to "ascertain if the Agency has any official relationships or contacts with Mr. Wilson within their respective areas of responsi-

bility" and to "determine if [he] has any unofficial relationships or contacts with . . . employees which could be construed as providing Mr. Wilson with official Agency support or assistance." Waller also asked the deputy director for administration to describe Wilson's job assignments, including length, use of front companies, and his employment status. (Wilson Mot. to Vacate, Ex. 11 ¶¶ 2–3.)

In response to Waller's request, one director sent his staff a cable in May, giving them two days to find out if employees had official or unofficial relationships with Wilson. He ended the request with the advice that "negative reports [are] desired." (Gov't 0020191–2.) A few days later, a special assistant to the deputy director for operations told Waller about four official contacts Wilson had had with the agency and numerous social contacts with CIA employees, including annual picnics, hunting, and horseback riding at Wilson's 2,500–acre farm in Virginia. Wilson even "sold" a two-year-old registered quarterhorse worth $1,500 to a high-ranking CIA official for $100 and stabled it as his farm. (Wilson Mot. to Vacate, Ex. 12; Gov't 0034818, 0034591; Gov't App., Ex. K.)

A reliable source with the FBI told the Department of Justice that the Wilson was a contract employee of the CIA as recently as summer or early fall of 1976. (Gov't 118990.) At the FBI's request, the CIA suspended its investigation for several weeks in late 1976. The CIA's inspector general "stood down" in May 1977, having interviewed at least fifty employees and some U.S. company officials. (Wilson Mot. to Vacate, Ex. 26.)

One employee interviewed, Theodore G. Shackley, the associate deputy director for operations, said he did not think Wilson was providing support for terrorist groups in Libya. He mentioned that Wilson had recently provided the CIA with two "operational leads" in Libya. Actually, Shack-

ley met with Wilson on a regular basis, reporting on Wilson's revelations and even ordering CIA traces to see if Wilson's information was of "potential operational interest." (Gov't 0020955–7, 0020961–4.) He later admitted to the grand jury that he would refer Wilson's interesting "operational" information about the international weapons market, the Libyan regime, and other subjects to "the area specialist at the Agency who worked on those geographic problems." (Wilson Mot. to Vacate, Ex. 21 at 8–9.)

As the media's interest increased, Shackley told another CIA employee that, "Ed's a little hot now" and advised him that, if he was going to use Wilson, he "shouldn't request a provisional operational approval." Instead, "he should use Wilson informally for operational contacts, i.e., using Wilson unofficially for introductions would be alright but that [he] should not send in any request for clearances, etc. as it concerned Wilson." (Gov't 0034620.)

The month after stopping the investigation, the inspector general met with Thomas Clines, the deputy director of operations. Five employees had described Wilson as a close friend of Clines. Clines himself had remarked that he could always count on Wilson to finance agency projects that required immediate action. Clines acknowledged to the inspector general that his office continued to have "operational discussions" with Wilson during which it asked for—and shared—information. The CIA chose to portray these meetings as "informal social dialogue." Waller later told the CIA's deputy director that "it is difficult to believe that Clines, knowingly and on purpose, signified that CIA condoned the shipment of explosive timers when he knew how upset CIA management was by this whole subject . . . ." (Gov't 0064557, 112779, 0005515, 0005364, 0064608.)

B. 1981–1983.

In 1981, Wilson was a fugitive in Libya, accused of shipping explosives to Libya. In October, another scandal broke when the U.S. news media linked Wilson and Clines, now retired from the CIA, to the surreptitious award of a lucrative contract to ship U.S. arms to Egypt. One article proclaimed, "CIA Renegade Lurks Behind Egypt Scandal." WASH. POST, Oct. 19, 1981, at A13. When the House Permanent Select Committee on Intelligence decided to investigate, Admiral B.R. Inman asked the CIA's inspector general to search its files about Wilson and conduct follow-up interviews. (Wilson Mot. to Vacate, Ex. 25.) The Department of Justice, ATF, FBI, and United States Attorneys for the District of Columbia and the Eastern District of Virginia also investigated.

They confirmed that Wilson had continued to work for the CIA after 1971. By September 1981, CIA Director William Casey advised the chairman of the House Committee that the CIA had "several [inspector general] memoranda discussing specific allegations of improprieties by three Agency employees and a summary of known contacts between CIA and Edwin Wilson." He added, "These documents, plus relevant Office of Security memoranda to the DCI and several key memoranda for the record constitute a package of about one linear inch . . . ." (Wilson Mot. to Vacate, Ex. 22 at 1.)

A memorandum to the inspector general in June 1982 reports that "Agency personnel maintained a continuing personal/professional relations with Edwin Wilson after his resignation; in some cases these relationships continued until Wilson fled the country." It then describes seventeen "incidents" that "would help support a Wilson defense that he conducted some or part of his post resignation activities for CIA, i.e. that he had a role in CIA operations and insider knowledge of CIA concerns . . . ."

The inspector general later cautioned that this list "is not exhaustive since we found one other problem after it was compiled" and advised that "we should not expect that any other list that we or anyone else might compile would be definitive." (Gov't Supp., Ex. K.)

In October 1982, another memorandum summarized the CIA's continuous "use" of Wilson and his company—as a contact, an expert, a supplier—at least thirteen distinct times from 1972 through 1977. A different memoranda detailed at least nine contacts between Wilson and CIA employees between 1973 and 1976, and described twelve "cover" companies with which Wilson was associated, including World Marine, Inc., a top secret Navy firm that Wilson managed after he left the CIA. (Gov't App., Exs. A–C; 0020231.)

Still, this did not scratch the surface. In November 1982, Charles A. Briggs, the executive director of the CIA, finally appointed a CIA employee to review records and authorized "access to all records systems of the Agency for purposes of searching those records for material that in any way pertains to Mr. Wilson or his activities, and reviewing the results of previous searches done." The employee would testify about the records at Wilson's trials. (Gov't 0034558.)

In February 1983, James H. Taylor, the CIA's new inspector general, complained that listing every official or quasi-official contact between CIA employees and Wilson since 1971 would require the CIA

"to research approximately *three* safe drawers of data . . . . [and] a substantial amount of material that the Office of the General Counsel holds . . . ." He mentions one or two incomplete lists of at least 100 agency contacts with Wilson but concludes, "No matter what we all do, we will never be able to come up

with an exact, complete list of all Agency/Wilson contacts . . . ." (Gov't App., Ex. K, emphasis added.) The man charged with intra-agency integrity said that (a) agency contacts were too many to count, (b) counting them would be too much work, and (c) the result would be unreliable. The affidavit did not tell Judge Sterling or the jury that the CIA simply did not know whether it had used Wilson after he left its formal employment. "None" and "Unknown" are very different answers.

When the inspector general did attempt to count, the magnitude of Wilson's involvement with the CIA became stark: the CIA found eighty non-social contacts between Wilson and CIA employees, including almost forty times where Wilson furnished services to the CIA between 1972 and 1978. (Wilson Mot. to Vacate, Ex. 101.)

Although the CIA's general counsel said that these numbers accurately reflected agency records and included everything that could "remotely be considered 'business contacts,'" the report did not tell the whole story. (Wilson Mot. to Vacate, Ex. 100.) Even while investigating—and officially distancing itself from—Wilson, the government was still gathering intelligence from him. While Wilson was a fugitive in 1981, the FBI, ATF, and assistant United States Attorneys from the District of Columbia interviewed him in Rome, Italy, in July 1981. As a show of good faith before the interviews, Wilson produced documents for the CIA about Libya's nuclear program, including technical plans for manufacturing an atomic device. He also offered to tell the government the locations of two fugitives wanted by the United States for assassinating Letelier, the Chilean diplomat. (Gov't 0020662.)

Over three days in Rome, Wilson provided information about Iran, Russia, Taiwan, and Libya. He described Libya's military equipment, assassination teams, intelligence fronts, and identified (a) American, British, and Italian companies supplying Iran with military parts or servicing Qaddafi's personal aircraft and (b) Americans assisting or taking bribes from the Libyans. The government asked for information on forty-one people; Wilson offered information on twenty-nine of them. (Gov't 0020662–7, 0020419–27.)

Handwritten notes taken by Admiral Daniel Murphy, the Vice President's chief of staff, in November 1981 reveal that Wilson also produced papers to prove his allegiance to the United States and his innocence of most charges. (Gov't 0057326.)

When the government later decided to "capture" Wilson and bring him to the United States to face trial, it thought favorably of Wilson's usefulness as a source of intelligence. As one assistant United States attorney told Attorney General William French Smith, "[T]he information [Wilson] could provide us with regard to current activities in Libya could prove of uncalculable [sic] value." (Wilson Mot. to Vacate, Ex. 29 at 5.)

4. *Texas Trial.*

In June 1982, the government lured Wilson out of Libya and brought him to the United States. On July 19th, Wilson was indicted in the Southern District of Texas for:

- Conspiring to ship 20 tons of C–4 plastic explosives to Libya,

- Presenting a falsified shipper's export declaration,

- Exporting explosives without a license, and

- Transporting explosives by cargo aircraft in October 1977.

After a two-week trial, a jury convicted Wilson on all four counts on February 5,

1983. He was sentenced on February 18, 1983, to seventeen years and fined $145,000.

## A. *Defense.*

Wilson defended himself against the charges by saying that he had acted—at least implicitly—under the direction and authority of the CIA. In response to a pretrial order, Wilson told the court that he had done work on at least eight particular projects for a variety of government intelligence agencies between 1976 and continuing until he left Libya in 1982, including Naval Intelligence from 1971 through 1976. For example, he said that he was collecting intelligence for the CIA about Soviet military operations in Libya and about Qaddafi's regime. He claimed that from 1976 through 1979, he gave the CIA (a) profiles of Libyan officials, (b) information about Libya's nuclear capability, (c) possible coup information, and (d) Libyan military mobilization along the Egyptian border. (Gov't 005500.) The court allowed Wilson to try to show that he continued to furnish the government with intelligence that he gathered abroad after he resigned; however, it did *not* let him present evidence on particular projects. Three witnesses testified on Wilson's behalf: Richard Secord, Roberta Jean Barnes, and John Keats.

## B. *Response.*

To rebut Wilson's evidence, on February 4, 1983, the government introduced an affidavit from Charles A. Briggs. Briggs served as the CIA's inspector general until mid–1982 when he became its executive director—the third highest ranking official of the CIA. In the affidavit, he swore that—with one exception—the CIA did not ask Wilson to work for it after he officially stopped working there. Briggs declared:

- "The search [of CIA records] revealed that Mr. Edwin P. Wilson terminated his employment with the CIA on 28 February 1971, and was not re-employed thereafter in any capacity.
- According to Central Intelligence Agency Records, with one exception while he was employed by Naval Intelligence in 1972, Mr. Edwin P. Wilson was not asked or requested, directly or indirectly, to perform or provide any service, directly or indirectly, for [the] CIA."

(Wilson Mot. to Vacate, Ex. 8, ¶¶ 3–4.)

Briggs signed the affidavit under penalty of perjury, and Stanley Sporkin—the general counsel of the CIA—certified it with his signature and the agency's seal. The prosecutors introduced the affidavit at trial despite the expressed reservations of some of the government's lawyers, including the CIA's general counsel. (Gov't Answer to Am. Mot. to Vacate at 30.) After deliberating for one day, the jury asked the judge to re-read the Briggs affidavit to them. An hour after the re-reading, the jury found Wilson guilty.

## 5. *Post-trial.*

Three days after trial but before sentencing, the government admitted internally that the affidavit was false. A CIA investigator excerpted the untrue paragraphs from the Briggs affidavit, and then drafted a memorandum titled "Notes for IG" that listed five solicitations and projects on which Wilson worked for the CIA *after* 1971, including a planned trip to Iran with the deputy director of operations to develop an agent there. The author noted that one CIA report implies that an agent asked Wilson to establish rapport with a Middle Eastern source. The employee who drafted the memorandum had conducted most of the pre-trial investigations on Wilson's post-employment contacts with the CIA; he knew the Briggs affidavit was false. (Wilson Mot. to Vacate, Ex. 85.)

Two days later, the CIA forwarded the memorandum to the United States Attorney's Office. That day, an attorney at the Department of Justice sent the deputy assistant attorney general of the criminal division a memorandum entitled "Duty to Disclose Possibly False Testimony" and summarizing case law. A handwritten note concludes, *"Plain* meaning of services → The affid. is inaccurate." (Wilson Mot. to Vacate, Ex. 88.)

The government debated what to do about the affidavit's "inaccuracies." Later that month, it drafted a letter to Wilson's attorneys, mentioning a few of Wilson's post–1971 contacts with the CIA but defending the affidavit. Deciding that the letter would open "the entire universe of questioned contacts [between Wilson and the CIA]," the government never sent it. It stood by the affidavit. (Gov't Answer at 40; Wilson Mot. to Vacate, Exs. 90, 92, 97.)

Doubts remained. Mark M. Richard, the deputy assistant attorney general of the criminal division, urged assistant attorney general, head of the criminal division, Daniel Lowell Jensen, "I think we must make a disclosure—either to the judge or the defense attorney (a third option is to disclose to both)." He also suggested that "[i]f we don't make the disclosure we must first examine what purports to be the universe of contacts and 'paper' our own files with our findings ...." As the "relevant players" prepared to meet again to discuss what to do, Richard concluded, "disclosure is, unfortunately, necessary. I suspect that I am in the minority." He was. After ten months of researching the law, reviewing records, and holding inter-agency meetings, the government never told the trial court or Wilson's counsel that it had knowingly used false evidence. (Wilson Mot. to Vacate, Exs. 95 at 2, 97, 110.)

6. *Appeal.*

In December 1983, the government filed its brief in the court of appeals. It did not acknowledge *directly or indirectly* that it knew that the Briggs affidavit was false. Responding to Wilson's hearsay argument against the affidavit's admissibility, it mentions two "business transactions" between Wilson and the CIA in 1974 and 1975: procuring two desalinization plants for Egypt and "house-hunting" for a Laotian general to the United States. (Gov't Answer at 45.) Mentioning two of the more innocuous uses of Wilson by the CIA did nothing to correct the record. Attaching the incomplete list of eighty contacts between Wilson and CIA or including Wilson's use in efforts to buy Soviet military hardware, like tanks and fighter jets, for the CIA would have given a more accurate picture of the relationship. Of course, the government could have produced records supporting Wilson's claim that the CIA knew—even authorized—the shipment of explosives to Libya. (Gov't 0028896, 0064608.) It did not.

The court of appeals affirmed Wilson's conviction. *United States v. Wilson,* 732 F.2d 404 (5th Cir.1984). Its ruling says nothing about the falsity of Briggs's affidavit or its effect on Wilson's conviction—most likely because the government only obliquely referred to its lie. The ruling simply says that the affidavit was admissible to prove—by certifying an absence of records—that Wilson was not associated with the CIA. *See* 732 F.2d at 413; Rule 803(10). Although the affidavit was admissible to prove a lack of records, it was false; the affidavit proved nothing but a lie.

The court of appeals read Briggs's statement to prove that "Wilson was not directly or indirectly associated with the CIA, or acting with the CIA's knowledge and approbation when he arranged and concluded

the C-4 shipment from Houston to Libya." 732 F.2d at 413-14.

Wilson also requested appellate relief on a discovery violation—that the government "had information about associations of certain people with the CIA which would have materially aided Wilson's defense." *Id.* at 414. The court of appeals found no violation after it reviewed the record; however, it is now clear that the government withheld from Wilson the memoranda it prepared that listed his post-employment associations with the CIA as well as all direct documents generated from his work with the agency.

7. *Years later.*

Many years after his conviction, Wilson discovered internal government documents that prove that the Briggs affidavit was false and that the prosecutors knew about it before they used it at trial.

Confronted with the documents, the government now admits—twenty years after using the affidavit to convict Wilson—that "With the benefit of retrospection and in light of all the information now known to the Department, it appears that the statement was inaccurate." It now says that "following Wilson's termination as a CIA employee, he was asked to perform or did perform what can be described as services on its behalf." (Gov't Answer at 52.)

Honesty comes hard to the government. It describes its non-disclosure as "information allegedly concealed by the Briggs declaration." (Gov't Answer at 64.) This is a semantic game—the information was not *allegedly* concealed; it was actively and actually concealed. The government also justifies its choice to remain silent by saying that, by the time it finished investigating its perjury, the case had been appealed and was outside of the district court's jurisdiction. (Gov't Answer at 57.) The government could have told the court of appeals.

The investigation is a dodge; there was no need to investigate: it knew the affidavit was false before it offered it. In November 1977, a "reliable source" in the FBI told the Department of Justice that Wilson was still a contract employee with the CIA as recently as summer or early fall of 1976. The department circulated this information in a November memorandum. (Wilson Mot. to Vacate, Ex. 13.) Another memorandum from an assistant United States Attorney for the District of Columbia to the Department of Justice confirms that the lawyers knew on December 6, 1979, that Wilson had worked on Navy projects—with the CIA's knowledge and coordination—through 1976, not 1972 as claimed in the affidavit. (Wilson Mot. to Vacate, Ex. 15 at 4.) If the lawyers still had doubts, they could have investigated the scope of Wilson's work for the CIA *before* they offered the affidavit, not afterward. Maybe they could have investigated those contacts before they presented the case to the grand jury. The record hints that some of the lawyers had misgivings about the position they were putting forth or doubted the CIA's forthcomingness. In October 1981, assistant United States attorneys Larry Barcella and Carol Bruce quizzed the CIA about Wilson, cautioning that:

> "there are some very real concerns that are born out of what we have learned over the past four months about the depth of the relationship that existed and continues to exist between Ed Wilson and [CIA officials] Theodore Shackley, Tom Clines, and others. . . . Did the CIA, or to your agency's knowledge, any other U.S. Agency solicit, collect or receive any information concerning the activities of Ed Wilson, Frank Terpil and their associates from January 1, 1976 to date that has not yet been reported to us? In connection with this, please provide us with a list of what you believe

you have already reported to us concerning their reported activities." (Wilson Mot. to Vacate, Ex. 23 at 2–3.)

Similar requests for a "definitive written response"—including questions about Wilson's role in buying Soviet military equipment for the CIA—were repeated by the FBI and the Justice Department in at least 41 requests for information from the CIA in 1981 and 1983. (Wilson Mot. to Vacate, Ex. 68 at 2.)

For its part, the CIA's general counsel warned its employees not to communicate with Wilson's lawyers as this "may cause them to believe that the Agency has material relevant to their client's interest. Thus, direct communication with them may actually trigger inquiries and discovery requests which the Agency would have to respond to." (Wilson Mot. to Vacate, Ex. 40.)

### 8. Burden.

The government shifts the burden to Wilson to explain why he did not earlier raise the falsity issue. Wilson bears no burden, for his witnesses at the trial saying the opposite provoked the affidavit. The burden now, instead, is that the government must justify (a) its use of the affidavit and (b) its failure to disclose the truth when other people knew it had been false. It alone lied. It alone possessed—and withheld—the information that documented the falsehoods. The government alone insisted on the affidavit rather than production of the underlying records. It alone had the underlying documents.

The government says that Wilson should have spoken up at trial or immediately afterward to impeach the Briggs affidavit. The government mischaracterizes its problem. It introduced the Briggs affidavit to *rebut* Wilson's evidence that he continued to work for the CIA after he officially stopped working for it. By his original evidence Wilson said that the government was wrong. Repeating himself after the government used the Briggs affidavit would not have bolstered his argument.

### 9. Effect.

The government says three reasons prevent Wilson's claim from succeeding. First, it says he waived the issue by not objecting to the affidavit's contents at trial. Second, it says that the prosecutors did not know or intend to make a false statement. Third, it says that the statement was not material to the prosecution and is not material now.

### A. Waiver.

█ The government says that Wilson cannot raise the issue of the false affidavit now because he did not raise it at trial. This argument is crisply counter-factual and circular. Wilson was not allowed to present evidence and specifics by the trial or appellate courts. Wilson sought to defend himself against the government's charges by showing that the government tacitly—at least—approved his activities in Libya. The government introduced the affidavit to contradict Wilson's witnesses and theory. Wilson objected to its use—if not its perjury. Wilson's entire defense opposed Briggs's assertions in the affidavit; he could not have done more to oppose it or to demonstrate its inaccuracy.

Also, Wilson could not have known during the trial that the government had investigated his continuing contacts with the CIA for several years and possessed many memoranda that detailed his post-employment activities. He knew, of course, that the government had files, notes, invoices, and other debris of modern operations, but it had declined him access to that material. The direct evidence that proves falsity was not available to him before trial, at trial, or after trial; it became available—in confu-

sion and pieces—after protracted opposition by the government in this review.

Wilson could not have proved that the affidavit contained a lie. He had his word—that he continued to work for the CIA after he officially left it in 1971—and the testimony of several witnesses, not the government's extensive documentary evidence. As Wilson explained, his secrecy oath to the government prohibited his taking or keeping classified documents; he was true to his word. The government alone had the documents. (Wilson Mot. to Vacate, Ex. G at 3.)

The prosecutors only gave Wilson's lawyer a copy of the affidavit the day before they introduced it at trial; they did not tell him that it did not reflect the records. They did not mention the lists of categorically contradictory information. Further, Wilson could not have raised the issue on appeal in this form because he still did not know about the documents government agents had prepared; he did object to its use at trial, a sufficient preservation of error. Wilson did not waive his perjury claim.

### B. *Intent.*

The government says that its use of the false affidavit was an innocent error. It says the law does not require a retrial when a man is convicted on manufactured evidence as long as the use was not intentional. Under the Constitution, an argument may be reasonably made that the government should be responsible for the integrity of the evidence that it presents. The costs of using unchecked or otherwise unreliable witnesses ought to be borne by the user. Unless other data contradict the testimony, the government can probably never know whether a co-defendant is shading his recollection to help himself. Retractions later by fellow crooks are inherently suspect. In this case, however, the falsity comes from high public officials with sole access to voluminous records—not some high-school dropout street-level drug dealer with a memory of one sale.

Among the people who knew the government—through the CIA and Department of Justice—was both failing to disclose records of Wilson's work and offering a false affidavit was the CIA's general counsel. Yet the Department of Justice refused his request to correct or not to use the false affidavit. This person was no obscure paper-shuffler; he had been director of enforcement at the Securities and Exchange Commission and, after his CIA tenure, became a federal judge. Similar careers were had by people at the Department of Justice.

The government must be responsible for its internal fabrication of evidence. The test is not the ingenuousness of the prosecutor but the integrity of the government itself. The government would like to restrict the scope of responsible knowledge to the individual prosecutor in the courtroom, but the prosecution is brought in the name of the United States of America. The evidence, now, shows that the hierarchies of both the Justice Department and CIA were as knowledgeable as was the individual talking to the judge and jury. The government's attempt to split the government into the personal belief of the least informed attorney will not work. The court has identified about two dozen government lawyers who actively participated in the original non-disclosure to the defense, the false rebuttal testimony, and the refusal to correct it. Governmental regularity—due process—requires personal and institutional integrity.

CIA attorneys told Assistant U.S. Attorney Ted Greenberg that the Briggs affidavit should not be used as evidence, as then written, and asked him not introduce it. He did.

CIA General Counsel Stanley Sporkin advised that, at minimum, the word "indirectly" should be removed from paragraph four. Deliberately, knowing the facts, Greenberg ignored the CIA attorneys' requests and used it. (Wilson Mot. to Vacate, Ex. 98 ¶¶ 3–5.)

Although it admits that it presented false evidence at Wilson's trial and now lists solicitations and services he performed post-termination, the government says that Wilson has not proved that the prosecutors *knew* that it was false. Persistence in this contention reveals that consistency is valued higher than fidelity at the Department of Justice.

First, the government says that the prosecutors meant "taskings related to the gathering of intelligence" where Briggs's affidavit reads, "asked or requested directly or indirectly to perform or provide services." (Gov't Answer at 54.) The government claims that none of the prosecutors realized that the phraseology that they used could be understood broadly. Broadly? At one point, the government decides that "contact" meant operational—that is, undercover espionage—assignments that had been formally cleared by the CIA hierarchy. This is a three-level, arcane, bureaucratic, and evasive interpretation of the plain meaning of Brigg's words.

Full disclosure would have required personal, commercial, operational, and other interpersonal exchanges to have been revealed to the defense and court as a matter of routine pretrial preparations.

Even after the prosecution's conversion of Briggs's statement into Newspeak, the plain implication of his words was that Wilson had had only one limited contact. That is false. Even with the Washington Jig around the text of the affidavit, the government cannot make its words coincident with the "truth, whole truth, and nothing but the truth."

When the CIA's general counsel worried to a deputy assistant attorney general that Wilson was about to be sentenced without the deception's having been disclosed, he replied that no harm would come from more delay and that there was "very little sentiment in DOJ to do anything about the Briggs' [*sic*] affidavit." Voices accurately recited law and urged compliance, but in the end, they were overwhelmed by the noise of the others and bureaucratic momentum.

Houston prosecutor Jim Powers participated in lengthy meetings at the Department of Justice where they discussed the techniques for dodging the plain meaning of the affidavit and the contradictory material. This is the same attorney who answers Judge Sterlings's question "that all Brady is made available?" with "That is true." The judge followed with "From whatever source," and Powers responded, "If we discover them, we will be the first to let somebody know. . . ." After the prosecutors choose to ignore the CIA's own request for correction of the evidence, some CIA people generated memoranda to reflect their advice and its timing, preventing the agency being blamed by the prosecutors.

The government even claimed *in this review* that it did not have evidence of Wilson's work with the CIA after 1971. It now admits—correcting a "misstatement" in its response to the motion to vacate—that as early as January 1982 or, at the latest, by July 13, 1982, before Wilson's Texas trial started, the prosecutors knew that the CIA had employed Wilson in 1974 and 1975 to:

- Locate and deliver—through Consultants International—two desalinization units for Egypt;

- Find a residence in the United States for a former Laotian general;

- Demonstrate and procure body armor for the Iranian Imperial Guard;
- Trade weapons or explosives for sophisticated Soviet military equipment—like MiG-25 fighters, tanks, missiles, and ocean mines—with Libya; and
- Get information about Secret Service pistol ranges so Saudi Arabia could build its own.

(Gov't Suppl. Mem. at 2–6.)

The government's "new" information comes, in part, from a prosecutor's lengthy handwritten notes taken during a meeting with the CIA on July 13, 1982. Although the government says it just now found the notes in one of the "many boxes of Wilson-related material," it insists that Wilson's lawyer had access to the notes during discovery, although it cannot be certain. (Gov't Answer at 2.) The government does not even know now what information was included in the "Wilson file" given to the United States Attorney's Office before trial. (Gov't Answer at 11, n. 3.) Even if they were produced at some point, it is unlikely that the prosecutor's notes were reasonably obvious to Wilson's lawyer since the government is just now finding them, years later. The notes may not have been disclosed.

Equally troubling, the notes are derived from documents that were not disclosed to Wilson's trial or appellate lawyers.

Regardless, Wilson's lawyer was entitled to have access to the documents describing the underlying specifics of his client's work for the CIA, not just unexplained, jumbled notes. Several pages of the prosecutor's notes mirror a detailed chronological summary of the CIA's use of Wilson and his businesses since 1971. That summary, and four others dating from 1973 through 1982, were circulated within the CIA on October 1, 1982; none was produced. (Gov't App., Ex. A.)

Now that the government has admitted that it did have access to the information, it claims that:

This information concerning the posture of the prosecutors' possible knowledge of the scope of Wilson's post-employment activities on behalf of the CIA does not dilute the vitality of our argument that the prosecution did not engage in deliberate deception in introducing the Briggs declaration at the conclusion of Wilson's trial .... That argument was based upon the prosecutors' understanding that the term "services" embraced only intelligence-gathering activities on the CIA's behalf and did not extend to commercial activities.

(Gov't Supp. Mem. at 6.)

Even if the imagined and twisted meaning of "services" is used, the affidavit is still false. With their knowledge of the nature of Wilson's work for the CIA, they deliberately deceived the court. One CIA officer discussed with prosecutors that sending tons—yes, tons—of explosives to a hostile power could be authorized if this country got good enough information in exchange. This is an exact parallel to facts of the indictment. (Ex. 73, p. 13.)

The one occasion when the government admitted "contact" with Wilson was apparently when the CIA paid to send an employee of Wilson's to Libya. Again, that is compellingly close to the charges.

Wilson's searches for information about pistol ranges for the Saudis and attempts to purchase Soviet arms and equipment—with the help of government bid sheets, ranking weapons and listing acceptable prices—are intelligence-gathering "services" covered by the affidavit, not commercial activities. (Gov't Supp. Mem., Ex. B at 0035170–71; Wilson Mot. to Vacate, Ex. 102 at 2; Gov't 0035169.) Wilson was not running a Burger King for employees; he was dealing in arms and information for

the CIA—the stuff of both espionage and his convictions.

Attempting to downplay the role its knowledge of the affidavit's falsity played, the government asserts: "Wilson was fully aware of his post-retirement activities on behalf of the CIA. This information would therefore not have come as a surprise." (Gov't Answer at 56, n. 15.) This dismissive statement misses the point; of course, Wilson knew what he had done for the CIA after he stopped working there. Wilson did not have and was not given the papers that showed what he knew. Wilson knew the data, so his surprise was not his dealings but the affidavit—that was a surprise. This position vitiates his right to compulsory process.

Also, Wilson did not know what government agencies were reporting about him during their investigations immediately before the trial. Nor did he know that the government had prepared many reports detailing the work he had done for the CIA, contradicting the affidavit, and corroborating his witnesses, and supporting his theory of defense. That information would have been invaluable to his defense and its credibility.

### C. *Materiality.*

The government says that the information that it *concealed* by presenting a false affidavit was irrelevant to Wilson's defense. It may not arrogate to itself the trial court's opportunity to decide that issue. It certainly cannot be said that no reasonable jurist would have found that evidence admissible. The court heard Wilson offer three witnesses to testify about some of his interactions with the CIA. If the trial court had had the opportunity to review the undisclosed information, it could have ruled on its relevance and admissibility; however, the government peremptorily and illegally excluded the defendant and court from the process. It now

is bound by its having offered the affidavit and by the ruling of the trial court that it was relevant; if the affidavit was relevant, the actual facts that it was supposed to represent cannot be irrelevant. If it was material. enough for the government to represent that it contradicted Wilson's witnesses and theory, it was material to affect the jury's deliberations. The government's position is, hypothetically, that (a) its affidavit from the assistant secretary of the interior that the park service truck was green is admissible but (b) the department's receipt for that truck showing that it was blue is irrelevant.

Among the government's problems is a contradiction. It says that Wilson's contacts were immaterial because they were insignificant non-espionage. Still, at a 25–year remove, it insists that the information be kept from the public. Wilson's work for· the agency cannot simultaneously be social-commercial trivia and a state secret.

The government also says that Wilson did not have a valid defense to the charges; therefore, proof that he continued to work for the CIA would not have led to an acquittal. Using earlier rulings by the courts of appeals against Wilson, the government says that Wilson does not deserve a new trial, but if the jury had known of the lie, its decision would have precluded an appeal at all. Also, the government did not argue on appeal that it lied in Briggs's affidavit; it argued that the affidavit was sufficient to rebut Wilson's evidence of continued relations. It cannot, however, use decisions of the courts of appeal based on a meretricious record to bar the relief that Wilson now seeks.

The court must determine if the perjury reasonably could have affected the jury's judgment. A juror's statements immediately post-trial suggest that the affidavit affected the jurors' verdict. A news story

reported: "Juror Betty Metzler said that panel was divided 11–1 almost from the start, and one juror was not convinced until Saturday morning by [a] rereading of Briggs's affidavit denying Wilson's actions had anything to do with the CIA." She continued, "There were several of us that thought that possibly the CIA might have something to do with that, but when they admitted that last affidavit, that convinced me." UNITED PRESS INT'L, Feb. 5, 1983, AM cycle.

■ Without considering the psychology of those particular jurors, a fully informed, disinterested, reasonable person would know that a high public official's swearing that no records supported Wilson's version of his relationship with the agency would be material, important, significant, or other similar weight all the way up to compelling. Because the affidavit was crucial to Wilson's defense and it influenced the jury's decision, it was material.

In the course of American justice, one would have to work hard to conceive of a more fundamentally unfair process with a consequentially unreliable result than the fabrication of false data by the government, under oath by a government official, presented knowingly by the prosecutor in the courtroom with the express approval of his superiors in Washington.

The government may not excuse its presentation of false testimony by claiming that (a) it did not know, (b) it did not understand what other agencies knew, or (c) it believed the testimony. It cannot use these excuses because they are not the law and the facts do not support them. See *Mesarosh, et al. v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and *United States v. Mason, et al.,* 293 F.3d 826 (5th Cir.2002).

The Supreme Court has dismissed the argument that the federal government is too unwieldy to require accuracy in its presentation of evidence, saying, "To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (Berger, C.J.).

Here, it was not that the right hand did not know what the left hand knew. The right hand knew and still misrepresented the facts. At justice's blindfolded eyes, the right hand made a fist, concealing the truth.

10. *Exculpating and Impeaching.*

Wilson says that the government also violated the Constitution by not furnishing him with documents that it possessed that would exculpate him. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The elements of a violation are:

- The evidence must be favorable to the accused, either because it exculpates the defendant or because it impeaches the government;
- The evidence must have been suppressed by the government, either willfully or inadvertently; and
- Prejudice must have ensued.

*Strickler,* 119 S.Ct. at 1948.

■ Incontrovertibly, the government did intentionally not give Wilson the memoranda that it had listing his contacts with government intelligence agencies after 1971. Equally incontrovertibly, the government furnished Wilson with none of the direct, operating documents that it used to derive the lists. The information in the lists and those documents certainly would

have impeached the Briggs affidavit. The government admits this in its later internal analyses about whether to disclose the falsity of the affidavit shortly after Wilson's trial concluded.

The government decided not to disclose the memoranda because it was not "impeachment of the type that has to be disclosed because [Wilson] knew of the info." (Wilson Mot. to Vacate, Ex. 112 at 1.) The law does not exempt information that the defendant knows from disclosure requirements. Although Wilson *knew* what he had done for the CIA, impeaching the government's witnesses by its own records would *prove* much more forceful and credible at trial.

To prove prejudice, Wilson must show "whether the favorable evidence could reasonably taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S., at 435, 115 S.Ct. 1555, *Strickler,* 119 S.Ct, at 1952. (Although it had an open file, the state failed to give the defendant statements made by a witness before trial that weakened, if not contradicted, her trial testimony.) The defendant must prove that "there is a reasonable probability that the jury would have returned a different verdict if her testimony had been either severely impeached or excluded entirely." 119 S.Ct., at 1955. Probability does not mean "more likely than not," a more demanding standard. 119 S.Ct., at 1956 (Souter, J., concurring).

Wilson has shown a reasonable probability of a different result had he been able to impeach the affidavit with the government's documentation that, after early 1971, he worked at least 80 additional instances for the CIA.

For example, CIA employees who negotiated a sale of the bomb timers to a hostile country were fired, but the United States Attorney for the Eastern District of Virginia declined to prosecute them. Another one was reprimanded for introducing an employee to Wilson and for meeting with someone supplying timers abroad. This was in the files, but denied by Briggs's statement. These contacts are what Wilson said was happening—his defense.

Still, the files may not be reliable on a different issue: one of the CIA men told the ATF and CIA officers not to worry about an associate because he would change his file to show he was going against the agency. (Gov't 0035208)

Briggs swore that, with only one exception, Wilson stopped working for the CIA in 1971. If Wilson had had the government's extensive documentation that showed that he had contact with the CIA at least 80 more times, the jurors very likely would have believed Wilson's theory and acquitted him. (Wilson Mot. to Vacate, Ex. 101.) With only his word, Wilson could not effectively counter the public official's document saying that he had not continued to work for the CIA. Only an hour after it requested a re-reading of the affidavit, the jury returned its guilty verdict. Then, a juror reported to the press that the affidavit had played a critical role in the jury's guilty verdict.

Although it was a different trial on different facts, Wilson had been acquitted of similar charges, revealing that the government was not necessarily bringing irrefutable cases.

This sort of behavior is among the reasons that the Constitution allows an accused to confront the witnesses against him. Instead of a witness whom Wilson could examine before the jury, in his Texas trial Wilson was contradicted by a dishonest agency memorandum issued from a bunker in Virginia.

### 11. Bureaucracy.

Throughout this case's long history, the government has alternated between being unable and being unwilling to coordinate among its agencies and to produce timely information about Wilson. It has moved the walnut shells constantly hoping that the pea will not be found. It has been. At this late date, the court finds itself sorting through mounds of paper in no order—not by date, by subject, by agency, by Bates stamp, or even by complete document. Missing pages and poor quality photocopies, no indices or chronologies. Never mind that newspapers have done the work already. See, e.g., *Wilson Case: A Chronology*, WASH. POST, Nov. 21, 1982, at B5. The government did not even furnish a copy of that chronology of the many well-organized newspaper articles about Wilson's case. Instead, its agencies offer differing versions of easily verifiable facts, like when Wilson left Naval Intelligence or when Consultants International was incorporated.

The process has been further slowed by requiring (a) the court's clerks to get top secret clearances so they can wade through the data dump and piece together what the government has not had the inclination to do and (b) that Wilson's lawyers review documents in a vault. These security measures were undermined by the government's own sloppiness; for example, the Department of Justice admitted that, years into this review, commercial movers found two boxes of "secret" Wilson materials in an unsecured room.

### 12. Conclusion.

At the time of trial, some of the information may have still had significance, but while the government may choose to prosecute, it may not prosecute without telling the whole truth. If secrets—or errors—are too important to use·in a "speedy and public trial," the government simply makes the policy decision not to prosecute. If it chooses the criminal process, it will have to yield its information about both the offense and defense.

Wilson's defense obliged the CIA to gather all of the direct and secondary evidence of his association with the agency and to show it to Wilson's lawyer. If some of it might have hurt the interests of the country and if a means could not have been devised for its presentation in an abstract manner, then the charges might have to have been dropped.

America did not defeat the Axis because it locked up Japanese Americans. America did not defeat the Soviet Union because it tried to lock up its philosophic fellow-travelers here. America will not defeat Libyan terrorism by double-crossing a part-time, informal government agent.

The government's preparation, presentation, and preservation of false evidence are not the process that is due from the government. As Justice Sutherland observed, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (George Sutherland). The government has no legitimate interest in buying or presenting false evidence from outsiders— it has less than none in lying to the court itself.

The government may be able to prove beyond a reasonable doubt by legal evidence that Wilson is guilty of violating the law. It will have that opportunity because Edwin Paul Wilson's conviction will be vacated.

**Judgment Vacating Conviction**

1. The judgment of conviction and sentence of Edwin Paul Wilson is vacated.

2. The government has through February 6, 2004, to initiate a new trial.

3. In the event of an appeal, the retrial is stayed until set by an order post-appeal.